Charles M. PASCHAL, Jr., Regional Director of the Fifteenth Region of the National Labor Relations Board, for and on Behalf of the NATIONAL LABOR RELATIONS BOARD, Petitioner,

v.

SHEET METAL WORKERS INTERNATIONAL ASSOCIATION, LOCAL UNION NO. 11, Respondent.

Civ. A. No. 69–1738.

United States District Court E. D. Louisiana, New Orleans Division.

Sept. 4, 1969.

Charles M. Paschal, Jr., H. Sloan McCloskey, New Orleans, La., for petitioner.

Sidney W. Provensal, Jr., New Orleans, La., for Corrugated Asbestos Contractors, Inc.

Victor H. Hess, Jr., New Orleans, La., Donald W. Fisher, Toledo, Ohio, for respondent.

RUBIN, District Judge:

## FINDINGS OF FACT AND OPINION

The verified petition of Charles M. Paschal, Jr., Regional Director of the Fifteenth Region of the National Labor Relations Board ("the Board"), seeks a temporary injunction pursuant to Section 10(*l*) of the National Labor Relations Act, as amended ("the Act"), pending the final disposition of the matters involved herein pending before the Board. A hearing on the issues raised by the petition and answer was duly held on August 12, 1969. All parties were afforded a full opportunity to be heard, to examine and cross-examine witnesses, to present evidence bearing on the issue, and to argue on the evidence and the law. The Court has fully considered the petition, answer, evidence, arguments, and briefs of counsel. Upon the entire record, the Court makes the following:

### Findings of Fact

1. On or about May 29, 1969, Corrugated Asbestos Contractors, Inc. ("Corrugated Asbestos") filed a charge with the Board alleging that Sheet Metal Workers International Association, Local Union No. 11 ("Local 11") was engaging in unfair labor practices within the meaning of Section 8(b) (4) (i) and (ii), subparagraph (D), of the Act, 29 U.S.C. § 158(b) (4) (i) (ii) (D).

2. The charge was referred to the Petitioner as Regional Director of the Fifteenth Region of the Board.

3. Local 11 maintains its principal office at New Orleans, Louisiana; it is now and has been engaged within this judicial district in transacting business and promoting and protecting the interests of its employee members. Its business manager is Sidney LeBlanc, Jr.

4. Corrugated Asbestos, a Louisiana corporation with its principal office and place of business located at New Orleans, Louisiana, is engaged in the business of engineering, finishing, fabricating and directing the installation of industrial sheeting and accessories. Corrugated Asbestos annually purchases and receives goods and materials from directly outside the State of Louisiana, exceeding $50,000 in value each year.

5. Corrugated Asbestos is, and has been at all times material herein, engaged in commerce and in an industry affecting commerce within the meaning of Section 2(6) and (7) of the Act, 29 U.S.C. § 152(6) (7).

6. Since on or about May 1, 1966, Corrugated Asbestos has been a party to a collective bargaining agreement with Local 11 providing, *inter alia*, that Local 11 "shall be the sole and exclusive source of referrals of applicants for employment" with Corrugated Asbestos.

7. Since about 1958, Corrugated Asbestos has been a party to various collective bargaining agreements with the International Association of Bridge, Structural and Ornamental Iron Workers, AFL–CIO ("the Iron Workers").

8. Local 11 has not been certified by the Board as the collective bargaining representative of any of Corrugated Asbestos' employees engaged in the installation of Reynolds V–beam siding, nor has the Board issued an order directing Corrugated Asbestos to bargain with Local 11.

9. Since about 1960, Corrugated Asbestos has been assigning the work of installing Reynolds V–beam siding to its employees who are represented by, or members of, the Iron Workers, rather than to its employees who are represented by, or members of, Local 11.

10. Since on or about April 25, 1969, Local 2, Sheet Metal Workers International Association ("Local 2"), which has its principal place of business in

Kansas City, Missouri, has demanded that Corrugated Asbestos assign the work of installing Reynolds V–beam siding to employees who are represented by, or who are members of it, rather than to employees who are represented by, or members of, the Iron Workers. Corrugated Asbestos has refused to accede to these demands.

11. In furtherance of its demands, Local 2 caused a grievance to be filed against Corrugated Asbestos under the terms of the collective bargaining agreement with Local 11. Corrugated Asbestos concedes that this agreement applied to its work in Kansas City and to its relations with Local 2.

12. The collective bargaining agreement contains both a grievance procedure and a procedure for determining jurisdictional disputes. Grievances are determined by a procedure culminating with an appeal to the National Joint Adjustment Board for the Sheet Metal Industry ("The Sheet Metal Industry Board"). Jurisdictional disputes are presented to the National Joint Board for the Settlement of Jurisdictional Disputes. Despite the similarity in name to the Sheet Metal Industry Board, this is an entirely different group, set up to determine work assignments in jurisdictional dispute cases under the terms of Article XVII of the collective bargaining contract.

13. Corrugated Asbestos contended that the demand by Local 2 was a jurisdictional dispute, not a grievance. However, the Sheet Metal Industry Board decided that the dispute was a grievance and determined that Corrugated Asbestos was violating the collective bargaining agreement by not assigning the work to journeymen sheet metal workers. It assessed damages in the amount of $12,733.20, to be paid to designated charities, and further decreed that, if Corrugated Asbestos failed to comply with the award, its agreement with Local 11 "shall stand automatically cancelled."

14. On July 19, 1967, The International Sheet Metal Workers Association ("The International") forwarded a copy of the award to Local 11, with instructions that "Corrugated Asbestos Contractors has a period of thirty days from this date to comply with the decision."

15. On December 13, 1968, the Sheet Metal Industry Board ordered the contract between Local 11 and Corrugated Asbestos cancelled.

16. In furtherance of this order, on May 8, 1969, Local 11 cancelled its collective bargaining agreement with Corrugated Asbestos, effective May 31, 1969. As a consequence of this, since on or about June 2, 1969, Local 11 has caused Corrugated Asbestos' employees who are represented by, or who are members of it, to cease work and, since on or about June 2, 1969, Local 11 has refused to refer any additional employees to Corrugated Asbestos.

17. It may be fairly anticipated that, unless enjoined, Local 11 will continue or repeat the acts and conduct set forth in paragraph 16 above or, similar or like acts and conduct in violation of Section 8(b) (4) (i) and (ii), subparagraph (D), of the Act.

*OPINION*

The Act provides in part:

"It shall be an unfair labor practice for a labor organization or its agents— * * * to engage in, or to induce or encourage any individual employed by any person engaged in commerce or in any industry affecting commerce to engage in a strike or a refusal in the course of his employment to * * * process, * * * or otherwise handle or work on any goods, * * * or to perform any services; * * * where * * * an object thereof is—* * * forcing or requiring any employer to assign particular work to employees in a particular labor organization * * * rather than to employees in another labor organization * * * unless such employer is failing to conform to an order or certification of the Board determining the bargaining representative for employees performing such work. * * *" Sec-

tion 8(b) (4) (i) (ii) (D), 29 U.S.C. § 158(b) (4) (i) (ii) (D).

Local 11 contends that it had no dispute with Corrugated Asbestos. Its argument is that Corrugated Asbestos was bound by the arbitration award and, when Corrugated Asbestos refused to comply with it, the business manager of Local 11 reluctantly told Corrugated's President that he was going to cancel the agreement with Corrugated Asbestos "because those were his instructions." It is also urged that Corrugated's employees who were members of Local 11 thereupon "all voluntarily quit their employment. They are not on strike, picketing or otherwise temporarily withholding their services, nor are they on lay off or leave status. They have now left their employment status with Corrugated."

■■ Local 11 has cancelled its contract with Corrugated Asbestos, refused to refer its members to Corrugated Asbestos for hiring, and, by notifying its members of termination of the collective bargaining agreement, encouraged them to discontinue working for Corrugated Asbestos. Those members stopped work simultaneously, and immediately after they were notified by Mr. LeBlanc of the cancellation of the union contract. In a subsequent meeting with sheet metal contractors in the New Orleans area, Mr. LeBlanc said that the sheet metal workers meant business in connection with work assignments and that there was one representative present whose contract had been cancelled. This clearly referred to Corrugated Asbestos and indicated that contract cancellation was used as a means of requiring the assignment of disputed work to sheet metal workers. It is therefore clear that Local 11 has violated the Act by encouraging or inducing its members to engage in a concerted refusal to work for Corrugated Asbestos; where there is such a concerted refusal, the Act is violated whether or not there is a picket line or a formal strike.

Local 11 also urges that it did not have as its object forcing or requiring Corrugated Asbestos to assign particular work to its members or to any other union; it was merely carrying out orders from The International.

■ But the Act does not require that the labor organization shall have formulated the proscribed purpose as its own objective. The Act forbids a concerted refusal to work where "*an object* thereof" is to force a particular work assignment. It is beyond dispute that Local 2 had the forbidden objective in mind and that The International, with which it was acting in concert, had this objective.

■ Local 11 asserts that it was acting as "the messenger for the National Joint Adjustment Board," and that the Joint Board is not a labor organization. But it is conceded in its brief that the object of Local 11 "was to carry out his (sic) instructions from the International." The correspondence instructing Mr. LeBlanc to act was from The International. And the object of both Local 2 in initiating the grievance procedure and of The International in causing Local 11 to cancel its contract was to force assignment of the disputed work to Sheet Metal Workers rather than to Iron Workers.

■■ At the least, Local 11 was an instrument used by Local 2 and The International to carry out a proscribed purpose. Its conduct violates the Act, for the Act does not limit the unfair labor practices condemned by it to those initiated by the person charged: it also forbids such actions by one who is employed by another to carry out a forbidden purpose. Injunctions issued pursuant to the Act have always run against individuals acting as agents as well as against principals, against union members who act on their union's instructions, as well as against the unions. A union that permits itself to be used to carry out an unlawful objective cannot carry out its actions free of restraint merely because it acts on orders from an International.

■■ Both Exhibit 3 (a letter dated May 8, 1969 from Mr. LeBlanc, Business

Manager of Local 11, to Corrugated Asbestos notifying Corrugated of the Local's cancellation of their agreement) and the discussion at the meeting held with the sheet metal contractors in New Orleans indicate that Local 11 did more however than act as a passive and unwilling medium; it made common cause with The International in its aim to get the disputed work assignment for Sheet Metal Workers. Local 11 neither disavowed nor protested the instruction to cancel its contract. It acquiesced in it, and joined with Local 2 and The International; it is in effect acting in concert with them. Local Union No. 26, 1967, 168 N.L.R.B. No. 118, 1968–1 CCH NLRB ¶ 21,989. Agency can be proved by circumstantial evidence. Schauffler v. Highway Truck Drivers & Helpers, 3 Cir. 1956, 230 F.2d 7, 10. Corrugated Asbestos had no agreement with Local 2 or with The International. Only Local 11 had a contract; only Local 11 could effectively cause a work stoppage by terminating its contract and refusing to refer employees to Corrguated Asbestos.

■ Of course a charge might have been filed against Local 2 in Missouri, or against The International, as the union suggests. But the fact that alternative, or even better, suits might have been filed is no basis on which to deny all relief here.

■ Nor does the filing of the charge here act as a deterrent to utilization of contractual grievance and arbitration procedures in any case that the grievance procedure is designed for. However, a grievance procedure cannot be invoked by one union as a means for provoking or resolving a jurisdictional dispute when the arbitration procedure is not consented to and binding on all of the parties to the dispute, Carpenters Local 581, 1952, 98 N.L.R.B. No. 346; Local 4, Electrical Workers, 1960, 129 N.L.R.B. No. 118, 1960 CCH NLRB ¶ 9461; New York Mailers' Union No. 6, 1968, 171 N.L.R.B. No. 119, Case No. 2–CD–367, 1968–1 CCH NLRB ¶ 22,522. Such an award does not bar 10(k) proceedings, for it does not resolve the dispute. A Board proceeding under § 10(k) takes precedence over an arbitration award. New Orleans Typographical Union No. 17 v. N.L.R.B., 5 Cir. 1966, 368 F.2d 755; New York Mailers' Union No. 6, *supra.*

■ Section 10(k), 29 U.S.C. 160(k), provides that the Board will hear and determine jurisdictional disputes only if the parties do not submit satisfactory evidence that they have either adjusted or agreed upon a method for voluntary adjustment of the dispute. The collective bargaining agreement between Local 11 and Corrugated Asbestos contains such a procedure; the problem here is that Local 2 has elected not to follow the jurisdictional dispute procedure and has insisted on treating its dispute as a grievance involving only Sheet Metal Workers and the employer, not a work assignment dispute involving the Iron Workers as well.

■ The issue is not whether Local 11 has violated the Act. It is only whether the Board has reasonable cause to believe that a violation has occurred. Schauffler v. Highway Truck Drivers & Helpers, 3 Cir. 1956, 230 F.2d 7; LeBaron v. Los Angeles Bldg. & Constr. Trades Council, S.D.Cal.1949, 84 F.Supp. 629, affirmed, 185 F.2d 405, vacated as moot, 342 U.S. 802, 72 S.Ct. 25, 96 L.Ed. 607; Brown v. Roofers & Waterproofers Union, N.D.Cal.1949, 86 F.Supp. 50. The relief requested in this proceeding is commensurate with the danger found by Congress to exist in work assignment disputes and is necessary to assure its discontinuance. Moreover, in instances where the public interest is involved, courts of equity may, and frequently do, "go much further to give relief than they are accustomed to go when only private interests are involved." For "the standards of the public interest, not the requirements of private litigation, measure the propriety and need for injunctive relief [in these cases]. Hecht Co. v. Bowles, 321 U.S. 321, 331, 64 S. Ct. 587, 592, 88 L.Ed. 754." Federal Trade Commission v. Rhodes Pharmacal

Co., 7 Cir. 1951, 191 F.2d 744, 747. Congress has found that the discontinuance of conduct such as that of Local 11 pending the disposition by the Board of the unfair labor practice charge is necessary "adequately to protect the public welfare which is inextricably involved in labor disputes." (S.Rep.No. 105, 80th Cong., 1st Sess., p. 8). "When Congress itself has struck the balance [between conflicting public interests] a court of equity is not justified in ignoring the pronouncement under the guise of exercising equitable discretion." Youngstown Sheet & Tube Co. v. Sawyer, 1952, 343 U.S. 579, 609–610, 72 S.Ct. 863, 897, 96 L.Ed. 1153. "And the proper working of the scheme fashioned by Congress to determine industrial controversies fairly and peaceably demands that the courts quite as much as the administrative body act as Congress has required." N.L.R.B. v. Bradford Dyeing Ass'n, 1940, 310 U.S. 318, 343, 60 S.Ct. 918, 931, 84 L.Ed. 1226.

Therefore, the injunction prayed for will be granted.