**LABORERS' INTERNATIONAL UNION OF NORTH AMERICA, LOCAL UNION NO. 309, AFL–CIO, Plaintiff-Appellee,**

v.

**W. W. BENNETT CONSTRUCTION COMPANY, INC., Defendant-Appellant.**

**No. 81–1180.**

United States Court of Appeals, Seventh Circuit.

Argued Oct. 28, 1981.

Decided Sept. 1, 1982.

William E. Defenbaugh, Jr., Westervelt, Johnson, Nicoll & Keller, Peoria, Ill., for defendant-appellant.

Jean F. Souders, Grenberg, Souders & Levine, St. Louis, Mo., for plaintiff-appellee.

Before BAUER and WOOD, Circuit Judges, and CAMPBELL,* Senior District Judge.

HARLINGTON WOOD, Jr., Circuit Judge.

Plaintiff-appellee Laborers' International Union of North America, Local 309 (Laborers), brought suit under § 301 of the Labor Management Relations Act, 29 U.S.C. § 185, for specific performance of the arbitration clause in its collective bargaining agreement with defendant-appellant W. W. Bennett Construction Co. (Bennett). The district court entered summary judgment for Laborers, and this appeal followed. We affirm.

## I

Bennett was the general contractor on a construction project in Rock Island, Illinois, known as the Friendship Manor Project. At that time, Bennett was party to a collective bargaining agreement with Laborers, the union which manned the work site. Bennett subcontracted certain plumbing work at the project to O'Dell Plumbing & Heating Co. (O'Dell). O'Dell had a collective bargaining agreement with Local 25 of the United Association of Journeymen and Apprentices of the Plumbing and Pipe Fitting Industry of the United States and Canada (Plumbers).

Laborers claimed that O'Dell's employees, who were represented by Plumbers, were performing certain work that should have been assigned to Laborers. After unsuccessful attempts to obtain the work, Laborers filed this § 301 suit alleging that Bennett had violated a provision of the Laborers-Bennett agreement which prohibited subcontracting out "any bargaining unit work over which [Bennett] has control ... except where the work will be performed by a sub-contractor who is bound by, or is willing to be bound by, the provisions of this agreement...." Laborers sought a court order compelling Bennett to submit to arbitration. The Laborers-Bennett agreement contains a broad arbitration provision which applies to "[a]ny dispute of any type concerning the interpretation or application of this agreement...."

Bennett has no bargaining agreement with Plumbers, and O'Dell has no bargaining agreement with Laborers. The Bennett-O'Dell subcontract provides that the subcontractor agrees to conform to the wage terms and "labor policies" of Bennett, but contains no arbitration clause.

Bennett answered the Laborers' complaint and filed a third-party complaint against O'Dell and Plumbers. The third-party complaint characterized the dispute as jurisdictional between two unions and asserted that therefore O'Dell and Plumbers were necessary parties. Plumbers filed a cross-complaint against Laborers, O'Dell and Bennett, claiming that all parties were bound to resolve jurisdictional disputes in a multipartite arbitration pursuant to the

* The Honorable William J. Campbell, United States Senior District Judge for the Northern District of Illinois, is sitting by designation.

procedures established in the Constitution of the Building and Construction Trades Department of the AFL–CIO.

Laborers moved for summary judgment. In response, Bennett contended that the dispute involves conflicting jurisdictional claims of two unions and that therefore bipartite arbitration would not be "proper." Bennett contended that it risked inconsistent awards and might have to pay twice for the same work.

The district court entered two orders adopting the findings and conclusions of the magistrate. In one order, the court entered summary judgment for Laborers holding that the complaint alleged a violation of the subcontracting clause and that Bennett was bound to arbitrate that issue with Laborers. In a separate order, the court dismissed the third-party and cross-complaints. Bennett appealed the first order, but no timely appeal was taken from the latter order. Plumbers filed a brief as *amicus curiae* on behalf of Bennett.

## II

In the *Steelworkers* trilogy, *United Steelworkers v. American Manufacturing Co.*, 363 U.S. 564, 80 S.Ct. 1343, 4 L.Ed.2d 1403 (1960); *United Steelworkers v. Warrior & Gulf Navigation Co.*, 363 U.S. 574, 80 S.Ct. 1347, 4 L.Ed.2d 1409 (1960); *United Steelworkers v. Enterprise Wheel & Car Corp.*, 363 U.S. 593, 80 S.Ct. 1358, 4 L.Ed.2d 1424 (1960), the Supreme Court defined the limited role of a court in a § 301 action brought to enforce the arbitration clause of a collective bargaining agreement:

> the judicial inquiry under § 301 is strictly confined to the question whether the reluctant party did agree to arbitrate the grievance.... An order to arbitrate the particular grievance should not be denied unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that cov-

ers the asserted dispute. Doubts should be resolved in favor of coverage.

*Warrior & Gulf*, 363 U.S. at 582–83, 80 S.Ct. at 1352–53. The Court further emphasized that "the means chosen by the parties for settlement of their differences under a collective bargaining agreement" must be given "full play." *American Manufacturing*, 363 U.S. at 566, 80 S.Ct. at 1345.

There is no question that the type of dispute here is subject to arbitration under the Laborer-Bennett collective bargaining agreement. Rather, the single issue presented is whether a district court may enforce a provision of a collective bargaining agreement calling for bipartite arbitration between the signatories where the defendant employer contends that the dispute is jurisdictional between the plaintiff union and a second union and should not be submitted to arbitration unless all parties involved in the dispute participate. For the purpose of this appeal, we assume that the dispute is jurisdictional.[1]

That a union may seek enforcement of a bipartite arbitration agreement over a work assignment dispute was acknowledged by the Supreme Court in *Carey v. Westinghouse Electric Corp.*, 375 U.S. 261, 84 S.Ct. 401, 11 L.Ed.2d 320 (1964). In *Carey*, the union (IUE) filed a § 301 suit in state court to compel the employer (Westinghouse) to arbitrate a disputed assignment of work to members of a second union. IUE's collective bargaining agreement with Westinghouse contained a grievance procedure for the use of arbitration in case of unresolved disputes involving the "interpretation, application or claimed violation" of the agreement. Westinghouse contended that the controversy actually presented a representation matter, not a jurisdictional dispute, and was thus within the exclusive jurisdiction of the NLRB. Rejecting this argument, the Court stated:

---

1. *See Local 1423, Glaziers v. P.P.G. Indus., Inc.*, 378 F.Supp. 991, 995, 996 (N.D.Ind.1974) (rejecting plaintiff union's characterization of the dispute). *But see Ben Gutman Truck Service, Inc. v. Teamsters, Local 600*, 484 F.Supp. 893, 894–95 (E.D.Mo.1980), *aff'd*, 636 F.2d 255 (8th Cir. 1980), wherein the court held that the plaintiff union's characterization of the dispute as involving subcontracting rather than representation controlled the question of arbitrability.

Are we to assume that the regulatory scheme contains a hiatus, allowing no recourse to arbitration over work assignments between two unions but forcing the controversy into the strike stage before a remedy before the Board is available? The Board, as admonished by § 10(k), [29 U.S.C. § 160(k)] has often given effect to private agreements to settle disputes of this character; and that is in accord with the purpose as stated even by the minority spokesman in Congress— "that the full opportunity is given the parties to reach a voluntary accommodation without governmental intervention if they so desire."

As Judge Fuld, dissenting below, said: "The underlying objective of the national labor laws is to promote collective bargaining agreements and to help give substance to such agreements through the arbitration process."

Grievance arbitration is one method of settling disputes over work assignments; and it is commonly used, we are told. *To be sure, only one of the two unions involved in the controversy had moved the state courts to compel arbitration. So unless the other union intervenes, an adjudication of the arbiter might not put an end to the dispute. Yet the arbitration may as a practical matter end the controversy or put into movement forces that will resolve it.*

*Id.* 375 U.S. at 264–65, 84 S.Ct. at 405 (citations omitted and emphasis added). In dissent, Justice Black, joined by Justice Clark, highlighted that holding:

> Stripped of obscurantist arguments, this controversy is a plain, garden-variety jurisdictional dispute between two unions. The Court today holds, however, that the National Labor Relations Act not only permits but compels Westinghouse to arbitrate the dispute with only one of the two warring unions. Such an arbitration could not, of course, bring about the "final and binding arbitration of grievance[s] and disputes" that the Court says contributes to the congressional objectives in passing the Labor Act.

*Id.* at 274, 84 S.Ct. at 410. Justice Harlan, concurring, also recognized that bipartite arbitration "will expose those concerned to the hazard of duplicative proceedings," but characterized the undesirable consequences as "conjectural." *Id.* at 273, 84 S.Ct. at 409.

The *Carey* Court did not mention whether tripartite arbitration was available. Thus, at its narrowest reading, *Carey* indicates that bipartite arbitration is permissible at least where the only alternative is no arbitration of the dispute at all. *See* 375 U.S. at 273, 84 S.Ct. at 409 (Harlan, J., concurring). The policy favoring finality, of which Justice Black wrote, suggests that preference should be given to methods of arbitration that can bind all parties involved. A broad view of *Carey*, however, is that the agreed-upon method of arbitration, when invoked by the plaintiff in a § 301 suit, must be given effect regardless of whether other, more dispositive arbitration procedures are available outside of the collective bargaining agreement. *See Nashua Typographical Union, Local 365 v. Telegraph Publishing Co.*, 365 F.Supp. 262 (D.N.H.1973). The Court's observation that bipartite arbitration "may as a practical matter end the controversy or put into movement forces that will resolve it" supports the latter view. Moreover, in the *Steelworkers* trilogy the Court showed strong deference to the grievance procedures established by the parties to a collective bargaining agreement. That policy, coupled with the possibility that bipartite arbitration could resolve the dispute, might render a court powerless to deny an order to arbitrate pursuant to the collective bargaining agreement. We need not decide which interpretation is correct since Bennett cannot escape *Carey* even at its narrowest reading.

Bennett's position in the district court and on appeal is merely that bipartite arbitration of a jurisdictional dispute is not proper. Bennett does not allege that multiparty arbitration is available—*i.e.*, that all parties involved in the dispute either are bound by or have consented to a single arbitration. In effect, Bennett wishes to avoid arbitration with Laborers under the grievance procedure to which it agreed in the collective bargaining agreement but offers no assurance that a more desirable alternative procedure is available.

### III

Two inroads have been made on the problem posed in *Carey* of an employer "trapped in a cross-fire between two unions." 375 U.S. at 275, 84 S.Ct. at 410 (Black, J., dissenting). One solution is procedural, the other contractual. Both are means of vesting in a single arbitrator the power to make binding interpretations of the two bargaining agreements; both place the two agreements before the arbitrator in a single proceeding.

### A

In *Local 416, Sheet Metal Workers International Association v. Helgesteel Corp.*, 507 F.2d 1053 (7th Cir. 1974), this court recognized that parties to a collective bargaining agreement may provide in the agreement that jurisdictional disputes must be resolved pursuant to an established inter-union dispute adjustment procedure which binds both unions. The sheet metal workers' union had obtained a bipartite arbitration award against the employer in a work assignment grievance and sought enforcement in federal district court. The collective bargaining agreement between the employer and the sheet metal workers contained a broad arbitration clause similar to the one here, but additionally provided that "[a]greement ... between Sheet Metal Workers' ... and other international unions, covering work jurisdiction ... shall be respected and applied by the Employer...." *Id.* at 1056. Article X of the Constitution of the Building and Construction Trades Department of the AFL–CIO provided that all jurisdictional disputes between affiliated unions "shall be settled and adjusted according to the present plan established" by the Department. *Id.* at 1055. Both the sheet metal workers and the competing union were affiliates under that constitution. This court construed the term "agreements" in the sheet metal workers' contract to include Article X and held that the provision deferring to inter-union agreements, rather than the arbitration clause, controlled. *Id.* at 1057. *See also Sheet Metal Workers International Association, Local 49 v. Los Alamos Constructors, Inc.*, 550 F.2d 1258 (10th Cir. 1977); *Labor-*

*ers International Union, Local 1440 v. Great Lakes Construction Corp.*, 484 F.Supp. 1300 (E.D.Wis.1980).

In *Local 1423, Glaziers v. P.P.G. Industries, Inc.*, 378 F.Supp. 991 (N.D.Ind.1974), District Judge Eschbach (now Circuit Judge) denied the plaintiff union's motion for summary judgment in a § 301 action to compel the employer to submit to arbitration under the grievance procedure in their collective bargaining agreement. Although the agreement did not contain a provision comparable to the one found controlling in *Helgesteel*, the employer alleged that it was not the entire agreement of the parties. The employer contended that it and the union were party to a national agreement which established a National Joint Board for the Settlement of Jurisdictional Disputes in the building and construction industry. *Id.* at 994. That agreement, according to the employer, was intended to supersede the bipartite grievance machinery of the collective bargaining agreement. The employer also submitted that it was bound to assign work in accordance with a jurisdictional agreement between the plaintiff union and the second union. *Id.* at 995. Noting that the Joint Board agreement provided a "quick and efficient means of resolving jurisdictional disputes" and that the Joint Board could bind all parties including the second union, Judge Eschbach ruled,

If it can be proven that these parties were in fact bound by all the agreements referred to, it is clear that it was intended that disputes in the nature of the instant dispute be submitted to the Joint Board, not the grievance and arbitration machinery provided in Article XVII of the local agreement.

*Id.* at 999. *See also Bechtel Corp. v. Local 215, Laborers International Union*, 544 F.2d 1207 (3d Cir. 1976). Judge Eschbach found that there existed a genuine issue whether the parties were so bound.

*Helgesteel* and *Glaziers* show that, especially in the building and construction industry, there is a clean contractual solution to the *Carey* problem. Bennett's answer and brief in opposition to Laborers' summa-

ry judgment motion failed to allege facts that would bring this case within *Helgesteel* or *Glaziers.* Bennett merely asserted that arbitration is not "proper" without the participation of Plumbers and O'Dell. The affidavit of Yale Phillips, attached to Bennett's response to the summary judgment motion, stated that the dispute arose over a work assignment, that Laborers threatened to invoke the subcontracting clause against Bennett because Laborers had no "leverage" with Plumbers, and that Laborers turned down an offer by Plumbers to have the dispute "arbitrated by the AFL–CIO under their grievance procedure." The last reference presumably is to the Impartial Jurisdictional Dispute Board (IJDB) (formerly the National Joint Board for the Settlement of Jurisdictional Disputes), a body established by the Building and Construction Trades Department, AFL–CIO. *See NLRB v. Plasterers' Local Union No. 79,* 404 U.S. 116, 120 & n.5, 92 S.Ct. 360, 363 & n.5, 30 L.Ed.2d 312 (1971). However, Bennett made no allegation that Laborers and Plumbers are member unions of the Building and Construction Trades Department and are thus bound to abide by an IJDB decision. Nor did Bennett allege that it and O'Dell were party to agreements binding them to IJDB decisions.[2] Moreover, the Laborers-Bennett agreement establishes a definite grievance procedure to resolve any dispute over "the interpretation or application of this agreement...." It sets forth a specific method of selecting a neutral arbitrator and defines the scope of the arbitrator's authority. Nowhere does that contract suggest an intent that work assignment disputes are to be adjusted by another method.

**B**

The Second Circuit in *Columbia Broadcasting System, Inc. v. American Recording & Broadcasting Association,* 414 F.2d 1326 (2d Cir. 1969) (*CBS*), recognized a procedural device which may be invoked to achieve "tripartite" (or, more accurately, joint) arbitration. *CBS* involved a § 301 suit brought by an employer to consolidate two pending arbitrations. One union had demanded arbitration with the employer, disputing an assignment of certain work to a second union. Subsequently, the employer served a demand for arbitration on the second union over the same matter. The employer had collective bargaining agreements with both unions, and each agreement contained broad arbitration clauses and expansive work assignment provisions. The district court ordered consolidation. 293 F.Supp. 1400.

The Second Circuit affirmed, finding authority for the district court's action in the "developing common law of labor contracts." 414 F.2d at 1329 n.1. The Second Circuit reiterated the Supreme Court's pronouncement in the *Steelworkers* trilogy that a collective bargaining agreement "calls into being a new common law—the common law of a particular industry or of a particular plant." 414 F.2d at 1328, *citing Warrior & Gulf,* 363 U.S. at 578–79, 80 S.Ct. at 1350–51. In particular, the court drew upon the statement in *Transportation-Communication* (discussed *infra*) that "it is necessary to consider the scope of other related collective bargaining agreements, as well as the practice, usage and customs pertaining to all such agreements." 414 F.2d at 1329, *citing* 385 U.S. 157 at 161, 87 S.Ct. 369 at 371. The court held that a district court has power under § 301 to order consolidation "when both unions had contracts with the same employer, and the employer ... seeks judicial action." 414 F.2d at 1328. The court further held that the district court properly exercised that power since both agreements contained broad arbitration provisions and the second union had agreed to arbitrate the dispute in accord with the method agreed upon by the employer and the other union. *Id.* at 1329.

**2.** *Amicus curiae* squarely raises a *Glaziers* issue but relies wholly on allegations stated in the Plumbers' cross-claim. Inasmuch as no timely appeal was taken from the separate dismissal of that claim, we are limited to the record Bennett established in response to Laborers' suit. Bennett, and thus *amicus curiae,* cannot make factual allegations on appeal that Bennett failed to present in its defense below.

Other courts have followed *CBS*, but in every case the two competing unions each had broad arbitration agreements with the same employer and the court acted upon a specific request to consolidate the arbitrations. *See Louisiana-Pacific Corp. v. IBEW, Local 2294*, 600 F.2d 219, 225–26 (9th Cir. 1979) (dicta); *Bell Aerospace Co. Division of Textron v. Local 516, UAW*, 500 F.2d 921, 923 (2d Cir. 1974); *Window Glass Cutters League v. American St. Gobain Corp.*, 428 F.2d 353, 355 (3d Cir. 1970) (dicta); *Baltimore Typographical Union No. 12 v. A. S. Abell Co.*, 441 F.Supp. 596 (D.Md. 1977), *aff'd without op.*, 588 F.2d 1347 (4th Cir. 1979); *Edmos Corp. v. Textile Workers*, 80 L.R.R.M. 3225 (S.D.N.Y.1972); *Nashua Typographical Union No. 365 v. Telegraph Publishing Co.*, 365 F.Supp. 262, 265 n.1 (D.N.H.1973) (dicta); *cf. Local 552, United Brick & Clay Workers v. Hydraulic Press Brick Co.*, 371 F.Supp. 818, 824–25 (S.D.Mo. 1974) (one union, two employers); *Textile Workers v. Scottex Corp.*, 344 F.Supp. 243 (S.D.N.Y.1972) (refusing to enforce inconsistent arbitration awards). In contrast, courts have declined to apply *CBS* where the employer failed to request consolidation until after being subject to inconsistent arbitration awards, *Louisiana-Pacific*, 600 F.2d at 225–26; *contra, Edmos, supra; Scottex, supra*, where the second union, although willing to participate in tripartite arbitration, was "not party to an arbitration agreement," *Glaziers*, 378 F.Supp. at 998, and where the plaintiff union had no "contractual nexus" with the second union to compel participation in the arbitration and the second union had no arbitrational dispute with the employer, *Meat Cutters, Local 229 v. Alpha Beta Markets, Inc.*, 95 L.R.R.M. 2509 (S.D.Cal.1977). A particularly significant case is *Nashua Typographical*, wherein the court, relying on *Carey*, rejected the employer's argument that "it is unfair to force an employer into bilateral arbitration over what is essentially a tripartite dispute." 365 F.Supp. at 264. The court, however, acknowledged in a footnote the *CBS* solution which permits an employer to "invoke[ ] the arbitration clause in its contract with the second union and sue[ ] both unions under § 301 to compel consolidation

of the two pending arbitrations." *Id.* at 265 n.1. Thus, the opinion can be read to hold that *CBS* cannot be used simply as a defense to a § 301 suit to compel arbitration. *See also Louisiana-Pacific*, 600 F.2d at 225–26. Moreover, in the usual case, both arbitration agreements had already been invoked, and thus the § 301 action was truly an action to consolidate pending arbitrations. Tripartite arbitration was not forced on anyone who was not already contractually obligated to proceed to arbitration.

Under the holding of *CBS*, consolidation is available at least where a single employer, faced with bipartite arbitration over a work assignment dispute, invokes the arbitration clause in its contract with the second union and sues both unions under § 301 to compel consolidation of the two pending arbitrations. Bennett, however, strips *CBS* of its factual dressing and asserts that *CBS* stands for the unadorned principle that bipartite arbitration cannot be ordered to resolve work assignment disputes. While we have some sympathy for Bennett's position, we do not believe that *CBS* goes so far. All of the basic consensual elements of arbitration were present in *CBS*. All parties were bound by arbitration agreements which covered work assignment disputes, each arbitration agreement had been invoked by a party to the agreement, and all parties agreed upon a single method to select a neutral arbitrator. Moreover, an action was filed in court specifically requesting consolidation. None of those factors are evident from the record before this court.

While the contours of *CBS* are not well defined as yet, it is clear that one basic principle remains intact: one who has not agreed to arbitrate will not be forced to arbitrate. There must be a contractual basis to draw all parties involved in the dispute into arbitration. Arbitration of labor controversies is wholly consensual, drawing its very existence from the agreement of the parties. The *Steelworkers* trilogy did not change "the long-established principle of law that compulsory arbitration cannot be properly awarded absent a contract be-

tween the parties agreeing thereto." *Independent Petroleum Workers v. American Oil Co.*, 324 F.2d 903, 906 (7th Cir. 1963), *aff'd*, 379 U.S. 130, 85 S.Ct. 271, 13 L.Ed.2d 333 (1964). As the Court stated in *John Wiley & Sons, Inc. v. Livingston*, 376 U.S. 543, 547, 84 S.Ct. 909, 912, 11 L.Ed.2d 898 (1964):

> The duty to arbitrate being of contractual origin, a compulsory submission to arbitration cannot precede judicial determination that the collective bargaining agreement does in fact create such a duty. Thus, just as an employer has no obligation to arbitrate issues which it has not agreed to arbitrate, so *a fortiori*, it cannot be compelled to arbitrate if an arbitration clause does not bind it at all.

*See generally* Bernstein, *Nudging and Shoving All Parties to a Jurisdictional Dispute into Arbitration: The Dubious Procedure of National Steel*, 78 Harv.L.Rev. 784 (1965). The decisions of the various courts ordering multiparty arbitration are consonant with this time-honored principle of arbitration.

Although the Phillips affidavit suggests that Plumbers may be willing to submit to arbitration, Bennett made no allegation that O'Dell is bound or has consented to participate. Bennett did not allege the existence of a collective bargaining agreement between O'Dell and Plumbers which provides for arbitration of work assignment disputes. Bennett draws our attention to its subcontract with O'Dell. The subcontract, while requiring adherence to the "labor policies" of Bennett, contains no arbitration clause and cannot alone provide a basis on which O'Dell may be drawn into arbitration over the work assignment. *See Hydraulic Press Brick*, 371 F.Supp. at 827; *United Steelworkers v. Crane Co.*, 456 F.Supp. 385, 389 (W.D.Pa.1978). *See also*

*United Steelworkers v. General Steel Industries, Inc.*, 499 F.2d 215, 217 (8th Cir. 1974), wherein the court refused to compel an insurer to submit to tripartite arbitration with the union and employer over insurance and pension rights of the workers since "it was not a party to the collective bargaining agreement and the interpretation of its contract was not subject to arbitration." Moreover, O'Dell is not party to the Laborers-Bennett bargaining agreement. *Cf., International Union of Operating Engineers, Local 103 v. Irmscher & Sons, Inc.*, 63 F.R.D. 394 (N.D.Ind.1973) (Eschbach, J.). Since, on the basis of the record before this court, O'Dell is not bound to arbitrate, we conclude that the district court was without power to order joint arbitration under *CBS.* Indeed, the record does not even show that Bennett moved for consolidation. Perhaps *CBS* could be extended to cover this situation if it were not for these absent elements, but a more precise interpretation of *CBS* is not necessary to decide this case.[3]

In support of its expansive reading of *CBS*, Bennett relies on *Transportation-Communication Employees Union v. Union Pacific Railroad Co.*, 385 U.S. 157, 87 S.Ct. 369, 17 L.Ed.2d 264 (1966), a case which arose under the Railway Labor Act, 45 U.S.C. §§ 151–163. In that case, the employer has assigned to the clerks' union new work that was created by the installation of electronic data processing equipment. The telegraphers' union, claiming jurisdiction to that work under its collective bargaining agreement with the employer, protested the assignment and referred its claim to the Railroad Adjustment Board. Without the participation of the clerks' union, and without considering the employer's contract with the clerks' union, the Board determined that the telegraphers' union was en-

---

**3.** Two additional obstacles to consolidation might exist. First, even if there is a Plumbers-O'Dell arbitration agreement covering work assignment disputes, there is a serious question whether Bennett, a stranger to any such agreement, has standing to initiate arbitration thereunder. *Cf., Local 12405, UMW v. Martin Marietta Corp.*, 328 F.2d 945 (7th Cir.), *cert. denied*, 379 U.S. 880, 85 S.Ct. 147, 13 L.Ed.2d 86 (1964). Second, the agreements may not pro-

vide for selection of an arbitrator by the same method. Other courts, however, have not viewed this as a problem. *See, e.g., Scottex*, 344 F.Supp. at 247; *Edmos*, 80 L.R.R.M. at 3227. *See also* Bernstein, 78 Harv.L.Rev. at 796, wherein the author contends that the consensual foundation of arbitration is not eroded provided the arbitrator comes from a neutral source.

titled to the work under their contract. The telegraphers' union filed an action in federal district court to enforce the award, but the court dismissed the case on the ground that the clerks' union was an indispensable party. The Supreme Court affirmed and ordered the case remanded to the Board with directions "to give once again the clerks' union an opportunity to be heard, and, whether or not the clerks' union accepts this opportunity, to resolve this entire dispute upon consideration not only of the contract between the railroad and the telegraphers, but 'in light of ... [contracts] between the railroad' and any other union 'involved' in the overall dispute, and upon consideration of 'evidence as to usage, practice and custom' pertinent to all these agreements." *Id.* at 165–66, 87 S.Ct. at 373–74.

The Court in *Transportation-Communication* stated that, in view of the "new common law" governing collective bargaining agreements, it was improper for the Board to resolve a work assignment dispute solely by reference to the contract between the employer and one union:

> In order to interpret such an agreement it is necessary to consider the scope of other related collective bargaining agreements, as well as the practice, usage and custom pertaining to all such agreements. This is particularly true when the agreement is resorted to for the purpose of settling a jurisdictional dispute over work assignments.

*Id.* at 161, 87 S.Ct. at 371. But the Court's decision that all relevant parties should be drawn into the proceeding was carefully rested on the statutory duty of the Board to settle the entire dispute. *Id.* at 162, 87 S.Ct. at 372. The Court noted that Congress created the Board to "provide for the *prompt* and *orderly* settlement of *all* disputes...." *Id., quoting* 45 U.S.C. § 151a(5) (Court's emphasis). Section 3 First (j) of the Railway Labor Act, 45 U.S.C. § 153, First (j), the Court further noted, provides that the Board "shall give due notice of all hearings to the employee or employees ... involved in any disputes submitted to them." *Id.* at 164, 87 S.Ct. at 373. The Court concluded that, since the clerks' union is "involved" in the dispute, the Board could not determine the whole dispute without an opportunity for the union to participate. *Id.*

Because the Railway Labor Act, rather than the collective bargaining agreements, was found to require a tripartite proceeding, *Transportation-Communication* provides a weak analogy at best. The NLRB under § 10(k), 29 U.S.C. § 160(k), has broad statutory powers to resolve jurisdictional disputes in a single proceeding. Id. at 165, 87 S.Ct. at 373, *citing NLRB v. Radio & Television Broadcast Engineers,* 364 U.S. 573, 582–83, 81 S.Ct. 330, 335–36, 5 L.Ed.2d 302 (1961). *See also NLRB v. Plasterers' Local Union No. 79,* 404 U.S. 116, 92 S.Ct. 360, 30 L.Ed.2d 312 (1971). In contrast, however, the authority of the arbitrator derives from the collective bargaining agreement. *Louisiana-Pacific Corp.,* 600 F.2d at 224. "[A]n arbitrator is confined to interpretation and application of the collective bargaining agreement; he does not sit and dispense his own brand of industrial justice. He may of course look for guidance from many sources, yet his award is legitimate only so long as it draws its essence from the collective bargaining agreement." *Enterprise Wheel & Car,* 363 U.S. at 597, 80 S.Ct. at 1361. *See also Hotel & Restaurant Employees v. Michelson's Food Services, Inc.,* 545 F.2d 1248, 1253–54 (9th Cir. 1976), wherein the court held that the arbitrator had exceeded his authority because the bargaining agreement did not authorize him to bring other parties into the arbitration. An arbitrator therefore cannot decide the rights and obligations arising under other collective bargaining agreements, although those agreements should, as stated in *Transportation-Communication,* be considered in construing the agreement at issue. Only if the arbitrator is empowered to make binding interpretations of both agreements in the usual three-party jurisdictional dispute can he resolve the entire controversy as would the NLRB. At a minimum, this would require that each union be bound by an arbitration agreement with its employer which arguably covers work assignment disputes.

■ Federal labor law favors only *voluntary* arbitration of disputes. Section 203(d) of the Labor Management Relations Act, 29 U.S.C. § 173(d), states, "Final adjustment by a method *agreed upon* by the parties is declared to be the desirable method for settlement of grievance disputes...." (Emphasis added.) Similarly, under § 10(k) the Board is without power to decide a jurisdictional dispute only where the parties to the dispute have "agreed upon the methods for the voluntary adjustment" of the dispute. *Compare IBEW, Local 104*, 248 N.L.R.B. 1144, 104 L.R.R.M. 1035 (1980) *with International Union of Operating Engineers, Local 17*, 254 N.L.R.B. 71, 106 L.R.R.M. 1094 (1981). In *Plasterers'* the Court refused to adopt a construction of § 10(k) that would coerce employers to accept compulsory arbitration of jurisdictional disputes. Faced with a dispute factually similar to the one here, the Court noted that the subcontractor, who had assigned certain work to members of a union with which it had a collective bargaining agreement, was not bound to arbitrate with the other union and did not even have a collective bargaining agreement with them. Thus, § 10(k) did not preclude Board action:

As § 10(k) passed the Senate, it directed the Board to decide the dispute *or* to order arbitration, but the arbitration alternative was deleted in Conference, and the amended bill was passed by the Senate over the strenuous objections of Senator Morse and others. By this amendment, the Court in *CBS* held that Congress had expressed a clear preference for Board decision as compared with compelled arbitration, and that this policy preference must be respected. 364 U.S., at 581–582, 81 S.Ct. at 335. Although this Court has frequently approved an expansive role for private arbitration in the settlement of labor disputes, this enforcement of arbitration agreements and settlements has been predicated on the view that the parties have voluntarily bound themselves to such a mechanism at the bargaining table. In both *Carey v. Westinghouse Electric Corp.*, 375 U.S. 261, 262, 84 S.Ct. 401, 404, 11 L.Ed.2d 320

(1964) and *Boys Markets, Inc. v. Retail Clerks Union, Local 770*, 398 U.S. 235 at 238, 90 S.Ct. 1583, 1585, 26 L.Ed.2d 199, the employers had acceded to binding arbitration as the terminal step of the grievance procedure. This concession is not present in the instant case; the employers here did not even have a collective-bargaining contract with the Plasterers. Section 10(k) contemplates only a voluntary agreement as a bar to a Board decision. As in *CBS*, we decline to narrow the Board's powers under § 10(k) so that employers are coerced to accept compulsory private arbitration when Congress has declined to adopt such a policy. *Id.* 404 U.S. at 133–34, 92 S.Ct. at 370–371 (Court's emphasis). *See also NLRB v. Local 825, International Union of Operating Engineers*, 326 F.2d 213 (3d Cir. 1964); *Bricklayers, Local 1 v. Sperandeo*, 322 F.Supp. 284 (D.Colo.1971); *Paschal v. Sheet Metal Workers, Local 11*, 304 F.Supp. 684 (E.D.La.1969). The compulsion inherent in NLRB jurisdiction does not extend to private arbitration.

■ If an employer is threatened by a strike or other coercive action taken to force the employer to make a contrary work assignment, the employer may file an unfair labor practice charge under § 8(b)(4)(D) of the National Labor Relations Act, 29 U.S.C. § 158(b)(4)(D). The NLRB in a § 10(k) proceeding has the power to resolve the entire dispute and require participation of all parties involved. Indeed, the Board has done so in cases factually similar to the one here. *See, e.g., IBEW, Local 104*, 248 N.L.R.B. 1144, 104 L.R.R.M. 1035 (1980); *Merck & Co., Inc.*, 151 N.L.R.B. 374 (1965). Congress specifically enacted those provisions "to protect employers from being 'the helpless victims of quarrels that do not concern them at all.'" *Radio & Television Broadcast Engineers*, 364 U.S. at 581, 81 S.Ct. at 335. Should the Board disagree with an arbitral decision, then the Board's ruling takes precedence, and the arbitral award will not be enforced. *Carey*, 375 U.S. at 272, 84 S.Ct. at 409; *Yellow Freight System, Inc. v. Automobile Mechanics Local 701*, 684 F.2d

526 (7th Cir. 1982); *Smith Steel Workers v. A. O. Smith Corp.*, 420 F.2d 1 (7th Cir. 1969). Until then, the law does not compel participation. *See* Bernstein, 78 Harv.L. Rev. at 788.

## IV

In this action, Bennett sought only to prevent bipartite arbitration. We therefore believe that Bennett would not be barred from later initiating a § 301 action to compel consolidation per *CBS*, if Bennett is able to allege facts sufficient to support such an action. But on the meager record in this case, we find no basis to disturb the district court's judgment.

AFFIRMED.