PRECEDENTIAL
UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

Nos. 08-3941/4084/09-1333
_____


TRENTON METROPOLITAN AREA LOCAL OF THE
AMERICAN POSTAL WORKERS UNION, AFL-CIO,
                    Appellant in 08-4084


v.


UNITED STATES POSTAL SERVICE,
                    Appellant in 08-3941


NATIONAL POSTAL MAIL HANDLERS UNION, AFL-
CIO
                    (Intervenor in D.C.)
                    Appellant in 09-1333
_____


On Appeal from the United States District Court
for the District of New Jersey
(D.C. No. 06-cv-2319)
District Judge:  Hon. Joel A. Pisano
_____


Argued
December 15, 2010

Before:  RENDELL, JORDAN and HARDIMAN, *Circuit Judges*.

(Filed: February 15, 2011)
_____

Stephan J. Boardman   [ARGUED]
United States Postal Service
Room 6248
475 L'Efant Plaza, S.W.
Washington, DC   20260

Teresa A. Gonsalves
United States Postal Service
Room 6433
475 L'Efant Plaza, S.W.
Washington, DC   20260

Colette R. Buchanan
Office of Unites States Attorney
970 Broad Street – Rm. 700
Newark, NJ   07102
        C*ounsel for Appellant US Postal Service*

Mark E. Belland   [ARGUED]
Steven J. Bushinsky
Jeffrey R. Caccese
O'Brien, Belland & Bushinsky
1526 Berlin Road
Cherryl Hill, NJ  08003
        *Counsel for Appellee Trenton Metropolitan*
        *Area Local of the American Postal*
        *Workers Union, AFL-CIO*

Richard A. Friedman
Zazzali, Fagella, Nowak, Kleinbaum & Friedman
150 West State Street
Trenton, NJ   08608

Bruce R. Lerner
Andrew D. Roth     [ARGUED]
Bredhoff & Kaiser
805 Fifteenth Street, N.W. - #1000
Washington, DC   20005
        *Counsel for Intervenor-Defendant,*
        *Nat'l Postal Mail Handlers Union, AFL-CIO*

_____

OPINION OF THE COURT
_____

JORDAN, *Circuit Judge*.

Appellant United States Postal Service ("USPS") and Appellant/Intervenor National Postal Mail Handler's Union ("NPMHU") (collectively, the "Appellants") appeal from the order of the United States District Court for the District of New Jersey, granting summary judgment to the Trenton Metropolitan Area Local of the American Postal Workers Union ("Trenton Metro") on Trenton Metro's claim for enforcement of a settlement agreement between it and USPS. The Appellants argue that the present suit involves a tripartite dispute over work assignments and is, therefore, subject to the tripartite arbitration agreement entered into nationally between USPS, NPMHU, and the American Postal Workers Union ("APWU"), the last of which is Trenton Metro's parent

3

organization. As a result, say the Appellants, the District Court erred both by looking to a separate agreement between USPS and Trenton Metro to resolve the dispute and by exercising jurisdiction in the first place. Because we conclude that the present controversy is a dispute over which union's workers can staff a specific mail sorting machine, we agree that this is a tripartite dispute over work assignments and that, consequently, the binding tripartite arbitration procedures apply. Accordingly, we will vacate the District Court's grant of summary judgment and will order the dismissal of Trenton Metro's complaint for lack of subject matter jurisdiction.

## I.     Background

### A.     The Contracts

#### 1)     *RI-399's Tripartite Dispute Resolution Procedure*

On April 16, 1992, USPS and the two unions representing its employees – APWU and NPMHU – entered into a Memorandum of Understanding called Regional Instruction 399 ("RI-399"). RI-399 is a national dispute resolution procedure, designed to resolve disputes over jurisdictional work assignments in any postal facility.[1]

---

[1] A "jurisdictional work assignment" refers to the assignment of a particular job to a particular union. Thus, a jurisdictional dispute is a dispute between the two unions over which union's workers should be assigned to a job.

Pursuant to RI-399, as of the date of its signing, all jurisdictional work assignments that were not then under dispute were "deemed as a proper assignment for that facility," and both unions agreed not to "challenge[] jurisdictional work assignments in any operations as they" existed at the time. (App. at 195.) Those undisputed work assignments were then to be listed in "inventories" of work assignments maintained at the local level. Going forward, any disputes over work assignments were to be resolved through the process outlined in RI-399, and those work assignments were then to be added to the inventories.

While RI-399 foreclosed the filing of new disputes over existing work assignments, it recognized three situations where new disputes could arise: (1) new or consolidated facilities; (2) new work in existing facilities; or (3) operational changes in existing facilities. It is undisputed that only the last of those situations is relevant to this case. RI-399 prohibits USPS from "engag[ing] in operational changes for the purpose of affecting the jurisdictional assignments in a facility," but recognizes that, nonetheless, operational changes "may result in the reassignment of functions from one craft to another."[2] (App. at 201-02.) Where operational changes do result in reassignment, USPS is required to present those changes, thirty days before they go into effect, to a Local Dispute Resolution Council consisting of representatives from each party to RI-399. The adversely affected party is then permitted to appeal the changes to binding tripartite arbitration, which must be held within sixty days after the changes go into effect. If, at any point, the

_____

[2] A "craft" refers to a particular category of unionized worker, with the categorization based on job functions.

5

dispute is settled, the resulting settlement agreement must be tripartite.

Six months after the execution of RI-399, an explanatory document called a "Q & A" about the RI-399 procedures (the "Q&A") was issued and signed by each of the three national parties. Item 3 in the Q&A clarifies that RI-399 applies even to grievances alleging violations of contracts other than RI-399, so long as one of the parties believes that the grievance relates to a jurisdictional dispute. In such situations, the question of whether the grievance relates to a jurisdictional dispute must itself be subjected to the RI-399 procedures (culminating in tripartite arbitration) prior to any resolution of the merits of the grievance. Item 4 states that any bilateral settlement agreement arising out of a jurisdictional dispute "is not a proper settlement and is considered null and void." (Supp. App. at 55.)

### 2) The USPS-APWU Bipartite Grievance Resolution Procedure

Separate and distinct from RI-399's tripartite procedure for resolving jurisdictional disputes is a broad bipartite grievance resolution procedure contained in the Collective Bargaining Agreement ("CBA") between USPS and APWU. That procedure is contained in Article 15 of the CBA ("Article 15") and is designed to resolve any grievance between USPS and APWU, with "grievance" defined as "a dispute, difference, disagreement or complaint between the parties related to wages, hours, and conditions of employment." (App. at 205.) On its face, Article 15 applies only to disputes "between the parties" – i.e., between USPS and APWU – and, therefore, Article 15 is inapplicable to

6

jurisdictional disputes involving both APWU and NPMHU (which is not a party to the CBA or Article 15). Instead, as noted above, all jurisdictional disputes must be resolved pursuant to RI-399.

For those grievances governed by Article 15, a four-step resolution procedure is defined, commencing with a discussion of the grievance with a local supervisor and escalating as needed through more formal local, regional, and national procedures, culminating in binding bipartite arbitration. Article 15, of course, allows for the grievance to be settled at any point prior to arbitration.

## B. Factual History

### 1) Trenton Metro's Grievance Over Operation of the AFSM-100

The Trenton, New Jersey mail-processing facility (the "Trenton Post Office") employs two groups of workers represented by the two union parties to RI-399: members of the mail processing clerk craft ("clerks" or "mail processors") are represented by Trenton Metro, and members of the mail handlers craft ("mail handlers") are represented by NPMHU. As mandated by RI-399, an inventory of undisputed work assignments is maintained at the Trenton Post Office (the "Trenton Inventory"), outlining which union has jurisdiction over various jobs at the facility. Included in the Trenton Inventory are work assignments for the Automated Flat Sorting Machine 100 ("AFSM-100"), of which there are three in the Trenton Post Office. The Trenton Inventory specifies that the AFSM-100 will normally be operated by five clerks. It allows, however, that heavy volume might periodically

require a sixth person to be added to the machine and that that person would normally be a mail handler. If reduced volume then requires that a person be removed, the Trenton Inventory does not state whether the mail handler must first be removed or whether a clerk may be removed. As a result, clerks were sometimes removed from the ASFM-100 prior to mail handlers being removed, and, on March 22, 2003, Trenton Metro filed a grievance under Article 15 protesting that practice. Because the grievance was filed under Article 15, it invoked only a bipartite dispute resolution process involving USPS and APWU, but excluding NPMHU.

When the grievance was not resolved at the first two steps of Article 15, it proceeded to regional arbitration at step three. On September 26, 2005, the regional arbitrator sent a letter to the representatives for USPS and APWU stating that "his first impression of the case is that it is a R.I. 399 matter," and, consequently, there was "a question as to whether or not the Mail Handlers should be invited to intervene." (App. at 300.) He asked the parties to clarify for him why the dispute was not "well beyond the scope of bilateral Regional arbitration." (*Id.*) Ignoring the concerns expressed by the arbitrator, on October 28, 2005, USPS and APWU, without including NPMHU, entered into a "full and final settlement" of the grievance (the "AFSM-100 Settlement"). That short agreement stated:

> The Trenton Inventory … designates work performed on the AFSM (see inventory) clerk work up to 5 Mail Processors per machine. The inventory allows a MH to be a sixth person during heavy volume. If reduction in work occurs, personnel will be moved in reverse

8

order. The result is the Mail Processors will not fall below the 5 required positions prior to the extra Mail Handler being taken off the operation.

(App. at 92.)

Thus, under that agreement, and pursuant to the Trenton Inventory, any mail handler added to the AFSM-100 during times of high volume would be removed first when there was a reduction in work.

## 2) *The Changes to the AFSM-100*

Between December 23, 2004 – ten months prior to the AFSM-100 Settlement – and February 8, 2006, USPS provided periodic updates to the national president of APWU regarding planned modifications to the AFSM-100, modifications that could result in "the elimination of one to two clerk positions" (App. at 319-323) at post offices around the country. In a final letter on February 8, 2006, USPS disclosed specific details regarding the modifications to the AFSM-100, which would consist of two enhancements: an Automated Induction ("AI") process and an Automated Tray Handling System ("ATHS"). AFSM-100 machines receiving both enhancements[3] (which the Trenton Post Office's machines did) would require one person to operate the AI's Load Station, one to four persons to operate the AI's Prep Station, one person to operate the AI's Feed Station, and one

_____

[3] USPS stated that some machines would receive only the ATHS enhancement, and some machines would receive no enhancements.

9

person to operate the ATHS. The USPS letter stated that mail handlers would have primary jurisdiction over the Load Station, Prep Station, and ATHS, while clerks would have primary jurisdiction over the Feed Station. Those jurisdictional assignments would result in just one clerk being staffed on modified AFSM-100 machines – obviously far fewer than what is specified in the Trenton Inventory and restated in the AFSM-100 Settlement. The proposed assignments for the newly enhanced AFSM-100 were later disputed by both the national APWU and NPMHU, and those national parties are presently engaged in tripartite discussions to resolve that jurisdictional dispute at the national level.[4]

---

[4] The upcoming changes to the AFSM-100 were not mentioned in the AFSM-100 Settlement. Nonetheless, Trenton Metro's president, William Lewis, who was involved in the negotiations leading to the settlement, stated that the forthcoming enhancements were "common knowledge amongst the parties" at the time and that "it was [his] intention to 'lock-in' clerk assignments to the AFSM in light of the pending modifications." (App. at 311, 313.) By contrast, Keith Reid, the Labor Relations Specialist who negotiated the AFSM-100 Settlement on USPS's behalf, stated that he "was not personally aware that enhancements were going to be made to the AFSM 100 in the future," and that during negotiations, the APWU never "mention[ed] upcoming enhancements to the AFSM-100." (App. at 169.) Reid stated that he did not intend the settlement agreement to govern staffing if there were operational changes but, rather, that RI-399 would govern the resolution of work assignments after any operational change. Whether Reid was aware of the upcoming changes and whether Lewis intended to "lock-in" the clerk assignments ultimately has no bearing on the

### 3) The 2006 Grievances and Trenton Metro's Lawsuit

In the spring of 2006, the planned enhancements were made to the three AFSM-100 machines at the Trenton Post Office. Subsequent to those modifications, two clerk positions were removed from each machine, while the mail handlers staffed on the machines remained.[5] In response, Trenton Metro filed a number of grievances under Article 15, alleging that by reducing the number of clerks on the AFSM-100 while leaving mail handlers in place, USPS violated the AFSM-100 Settlement. USPS responded that the staffing changes were the result of operational changes to the AFSM-100, and consequently, any dispute over those changes was a jurisdictional dispute covered by RI-399. USPS thus referred Trenton Metro's Article 15 grievances to the Local Dispute Resolution Committee pursuant to RI-399.

outcome of this case. The subsequent strategic behavior and subjective states of mind of the contracting parties do not change the import of the governing contracts.

[5] Those work assignments are inconsistent with the jurisdictional assignments for the modified AFSM-100 machines as set forth in USPS's letter, which would have resulted in only a single clerk working on each machine. Thus, the changed work assignments on the modified AFSM-100 machines in the Trenton Post Office did not result in as severe a reduction in clerk positions as had been laid out by USPS. Nonetheless, the number of clerks working on the machine dropped below five while mail handlers remained working on the machine, which is inconsistent with the AFSM-100 Settlement.

11

### C. Procedural History

#### 1) Trenton Metro's Complaint and the Motions for Summary Judgment

On May 18, 2006, prior to the resolution of any grievance at the local or national level, Trenton Metro filed suit in the District Court. Trenton Metro's complaint sought an injunction preventing USPS "from in any manner transferring bargaining unit work that would be in contravention of the [AFSM-100 Settlement]" as well as damages stemming from USPS's breach of the settlement. (App. at 57-58.) Trenton Metro and USPS filed cross motions for summary judgment, and on May 28, 2008, the District Court issued an order granting summary judgment to Trenton Metro on its claim for enforcement of the AFSM-100 Settlement but granting summary judgment to USPS on Trenton Metro's claim for damages.

With respect to enforcement of the settlement agreement, USPS had argued that the District Court lacked subject matter jurisdiction because Trenton Metro's claim constituted a jurisdictional dispute that was subject to the binding arbitration provisions in RI-399. The District Court disagreed, explaining that under 29 U.S.C. § 185(a), it had jurisdiction to enforce any "violation of contracts between an employer and a labor organization," including any settlement agreement that was "final and binding" and "sufficiently specific to be capable of implementation." (App. at 16.) The Court determined that, because Article 15 allowed for final settlement of disputes short of arbitration, the AFSM-100 Settlement was a "final adjustment of differences by a means selected by the parties," and therefore, final and binding.

12

(App. at 20 (quoting *United Mine Workers of Am. v. Barnes & Tucker Co.*, 561 F.2d 1093, 1096 (3d Cir. 1977)).) Next, because the AFSM-100 Settlement stated that the mail handlers would be removed before the clerks in the event of "any" reduction in work, the agreement applied to reductions in work due to modifications to the AFSM-100 and, therefore, the agreement was "sufficiently specific as to be capable of implementation." (App. at 21.) Consequently, the Court granted Trenton Metro's motion for summary judgment with respect to enforcement of the AFSM-100 Settlement.

With respect to damages, because the clerks who formerly staffed the AFSM-100 were all reassigned to other positions, and because Trenton Metro had not shown that USPS would have hired any new clerks or that "any clerk lost an identifiable amount of overtime wages based on a reassignment off the AFSM-100 machines," the District Court held that Trenton Metro had failed to establish any economic harm from USPS's breach. (App. at 23.) Finally, the Court denied both punitive damages and attorneys' fees, finding that the "present enforcement of the [AFSM-100 Settlement was] sufficient relief for Trenton Metro."[6] (App. at 24.)

---

[6] The Court denied subsequent motions for reconsideration by both parties, but granted a subsequent motion by Trenton Metro to enforce the judgment, although it considered it "duplicative of [the] Court's previous Ruling." (App. at 39-40.)

13

*2) NPMHU's Motions for Leave to Intervene and for Relief From Judgment*

On August 29, 2008 – three months after the District Court issued its order enforcing the ASFM-100 Settlement – NPMHU filed a motion for leave to intervene under Rule 24 and a motion for relief from the District Court's orders of enforcement under Rule 60(b). The District Court granted NPMHU's motion to intervene, finding that NPMHU's legal interests were affected by the disposition of the action, but the Court denied NPMHU's Rule 60(b) motion for relief from judgment because NPMHU had unreasonably delayed seeking relief and could not show "excusable neglect or unfair surprise under Rule 60(b)(1)." (Supp. App. at 5-6.) All three parties then appealed.

## II. Jurisdiction and Standard of Review

This Court has jurisdiction to review the District Court's judgment pursuant to 28 U.S.C. § 1291. Whether the District Court had jurisdiction is a question in dispute, but jurisdiction was asserted pursuant to the Postal Reorganization Act, 39 U.S.C. § 1208(b). Section 301 of the Labor Management Relations Act also empowers federal courts "to adjudicate suits for violations of contracts between an employee and a labor organization." 29 U.S.C. § 185. We review de novo the District Court's exercise of jurisdiction. *Shaffer v. GTE N.*, 284 F.3d 500, 502 (3d Cir. 2002). In determining whether a dispute should be resolved by arbitration, "there is a presumption of arbitrability," and any "[d]oubts should be resolved in favor of [arbitration]." *Lukens Steel Co. v. United Steelworkers of Am.*, 989 F.2d

14

668, 672 (3d Cir. 1993) (quoting *AT&T Techs. Inc. v. Commc'n Workers of Am.*, 475 U.S. 643, 650 (1986)).

We review the District Court's grants of summary judgment under a plenary standard, applying "the same test employed by the District Court." *Kautz v. Met-Pro Corp.*, 412 F.3d 463, 466 (3d Cir. 2005). We view all "evidence in the light most favorable to the nonmovant" and affirm "only if there is no genuine issue as to any material fact." *Kelly v. Borough of Carlisle*, 622 F.3d 248, 253 (3d Cir. 2010) (internal quotation marks and citation omitted).

## III. Discussion

On appeal, USPS and NPMHU ask us to vacate the District Court's order granting summary judgment, arguing that the AFSM-100 Settlement did not apply to this dispute and that the Court lacked jurisdiction over the dispute. NPMHU also challenges the denial of its Rule 60(b) motion for relief from judgment, and Trenton Metro challenges the grant of summary judgment to USPS on Trenton Metro's claim for damages.

We agree with the Appellants that the District Court erred by enforcing the AFSM-100 Settlement and by exercising jurisdiction over this dispute. As further explained herein, there are at least two reasons why the AFSM-100 Settlement cannot be enforced to resolve this dispute: First, the present dispute is a jurisdictional dispute over work assignments, and the record shows that the AFSM-100 Settlement was never intended to apply to jurisdictional disputes. Second, even if the AFSM-100 Settlement had been intended to apply to jurisdictional disputes, it is a bipartite

15

agreement, and the parties have previously agreed that any bipartite agreement purporting to resolve a jurisdictional dispute is void.

The conclusion that this is a jurisdictional dispute means not only that it cannot be resolved by the AFSM-100 Settlement but also that it must be resolved by the tripartite arbitration procedures outlined in RI-399. We therefore also conclude that it was error to exercise jurisdiction over this case in the first instance.

> **A. The District Court's Grant of Summary Judgment With Respect to Enforcement of the AFSM-100 Settlement**

In deciding that the AFSM-100 Settlement resolved this dispute, the District Court relied on our opinion in *United Mine Workers of Am. v. Consolidation Coal Co.*, 666 F.2d 806 (3d Cir. 1981). In that case, the parties' collective bargaining agreement contained a binding arbitration provision but allowed disputes to be resolved short of arbitration by settlement. 666 F.2d at 807-08. Any such settlement was, by the terms of the collective bargaining agreement, "final and binding." *Id.* The parties had entered into such a settlement agreement, and the plaintiff, claiming breach of that agreement, sought to enforce it in federal court. *Id.* at 808. The defendant claimed that the district court lacked jurisdiction because of the mandate in the collective bargaining agreement for binding arbitration of all disputes. *Id.* at 809. We held, however, that the existence of that arbitration provision did not necessarily preclude judicial enforcement of a settlement. Rather, noting that section 301 of the Labor Management Relations Act empowers federal

16

courts "to adjudicate suits for violations of contracts between an employee and a labor organization," we held that we could enforce a settlement agreement if it was "final and binding" and "sufficiently specific as to be capable of implementation." *Id.* at 809-10; *see also Barnes & Tucker*, 561 F.2d at 1096-97. We cautioned, however, that courts "are bound to exercise the utmost restraint to avoid intruding on the bargained-for method of dispute resolution, and when enforcement of an arbitration award or settlement agreement is sought under section 301, the court must be able to say 'with positive assurance' that the award or settlement was intended to cover the dispute." *Consolidation Coal*, 666 F.2d at 811. Thus, *Consolidation Coal* sets out three requirements for a District Court to enforce a settlement agreement to resolve a dispute that is otherwise governed by a binding arbitration provision: (1) the agreement must be final and binding; (2) the agreement must be sufficiently specific to be capable of implementation; and (3) there must be "positive assurance" that the agreement is intended to cover the relevant dispute.[7]

---

[7] At oral argument, USPS suggested that *Consolidation Coal* may be in tension with our decision in *L.O. Koven & Bro. v. Local Union No. 5767, United Steelworkers of Am.*, 381 F.2d 196 (3d Cir. 1967). The two cases can be read as in harmony, however. In *L.O. Koven*, we held that when a settlement agreement arises out of a collective bargaining agreement with a mandatory arbitration provision, "unless a release explicitly discharges the parties from the collective bargaining agreement itself, or from the arbitration provision thereof … its effect should be determined by an arbitral forum." *Id.* at 204-05. Thus, *L.O. Koven* pertains to disputes over the "effect" of a settlement

Relying on that rule, the District Court here first held that the AFSM-100 Settlement was final and binding because Article 15 (under which the grievance was brought) specifically allowed for settlement of grievances short of arbitration. The Court next held that, because the AFSM-100 Settlement called for mail handlers to be removed first when there was "any" reduction in work, it unambiguously applied even where the reduction in work was the result of modifications to the AFSM-100. Consequently, it found the agreement "sufficiently specific as to be enforceable," and further concluded "'with positive assurance' that the [AFSM-

---

agreement, whereas *Consolidation Coal* pertains to actions seeking enforcement of a settlement agreement when its effect is clear.

Therefore, when a grievance arises out of a collective bargaining agreement with a mandatory arbitration provision, any dispute about the effect of a settlement of that grievance must be arbitrated. *L.O. Koven*, 381 F.2d at 204-05. If, however, the agreement is final and binding, "sufficiently specific" to allow no dispute about its effect, and is plainly intended to cover the grievance, then it can be enforced in federal court. *Consolidation Coal*, 666 F.2d at 809-11. *Consolidation Coal* does not authorize courts to infringe in any way on parties' bargained-for dispute resolution procedures. Rather, where parties have already resolved their disputes through their bargained-for procedures and those procedures have given rise to an unambiguous, final, and binding settlement agreement or arbitration award, *Consolidation Coal* simply allows judicial enforcement of that settlement agreement or arbitration award.

18

100 Settlement] aimed to address the present grievance." (App. at 13-14.)

Despite the District Court's thoughtful approach to this case, we cannot agree that there is a "'positive assurance' that the [AFSM-100 Settlement] aimed to address the present grievance." (*Id.*) On the contrary, the present dispute implicates the staffing opportunities of the mail handlers as well as the clerks and, for that reason alone, is a tripartite jurisdictional dispute, which the AFSM-100 Settlement did not and could not address.

### 1. The Present Dispute is a Tripartite Jurisdictional Dispute

While the term "jurisdictional dispute" is not defined in any agreement of the parties, their use of the term and contextual clues make it clear that a jurisdictional dispute is any dispute over the question of which craft will get a work assignment – in other words, any dispute over which union's workers are properly staffed on a particular job. That is exactly the kind of dispute at issue here, as it arises out of Trenton Metro's claim that mail handlers have been assigned work on the AFSM-100 machines that should properly have been assigned to clerks – a claim that is, in turn, disputed by USPS and NPMHU.

Nonetheless, Trenton Metro argues that this is not a jurisdictional dispute because, for there to be a jurisdictional dispute under RI-399, there must have been an operational change[8] and "[t]here was no operational change to the AFSM

---

[8] As previously noted, *supra* § I.A.1, jurisdictional

19

through the implementation of the modifications."[9] (Brief of Cross-Appellant/Appellee Trenton Metro in 08-4084 at 24-25.) While the term "operational change" is not defined by RI-399, the significant modifications to the AFSM-100 – which automated a number of processes, resulted in "a reduction of the AFSM-100 operating crew," "decrease[d] operation run times" (App. at 319), and led to tripartite arbitration among USPS, APWU, and NPMHU at the national level – fall within any plain meaning of the term. Trenton Metro counters that the modifications "did not impact the remaining work functions" and that they therefore did not constitute an operational change. (Brief of Appellee Trenton Metro in 09-1333 at 23-24.) That argument, however, simply ignores the extensive overhaul and

disputes can also arise out of "consolidated facilities" or "new work," but no party contends that those apply here.

[9] We are not convinced that the existence of either "consolidated facilities, new work, or an operational change" is a condition precedent for RI-399 to apply. It may be that a better reading of RI-399 is that it unconditionally applies anytime the parties dispute a craft's jurisdiction. "Consolidated facilities," "new work," or an "operational change" appear to be merely categorical labels that describe the kind of dispute, and therefore, govern which subsection of RI-399 is to be followed to resolve that particular jurisdictional dispute. Nonetheless, because the parties seem to agree that there can be a jurisdictional dispute only if one of those circumstances is found to exist, and because our decision would be the same under either interpretation, we will decide the case using the interpretation on which the parties appear to premise their arguments.

automation of the AFSM-100 and the resulting reduction in run times and staffing requirements, all of which has been significant enough to require the USPS, APWU, and NPMHU to engage in national negotiations over altered work assignments. In short, on the undisputed facts, there plainly has been an operational change. Whether the job duties for the remaining workers remain identical and whether that identity should prevent USPS from changing work assignments are part and parcel of the parties' jurisdictional dispute in the wake of that operational change.

Having determined that the enhancements to the AFSM-100 have effected an "operational change," the next question is whether the AFSM-100 Settlement was intended to, or capable of, resolving the resulting tripartite jurisdictional dispute.

> ### 2. *The AFSM-100 Settlement Was Not Intended to Apply to Tripartite Jurisdictional Disputes*

The AFSM-100 Settlement provides:

> The Trenton Inventory … designates work performed on the AFSM (see inventory) clerk work up to 5 Mail Processors per machine. The inventory allows a MH to be a sixth person during heavy volume. If reduction in work occurs, personnel will be moved in reverse order. The result is the Mail Processors will not fall below the 5 required positions prior to the extra Mail Handler being taken off the operation.

21

(App. at 92.)

Both USPS and Trenton Metro ignored the suggestion by the regional arbitrator that the dispute giving rise to the AFSM-100 Settlement "[was] a R.I. 399 matter" and that "the Mail Handlers should be invited to intervene." (App. at 300.) Instead, both USPS and Trenton Metro treated the AFSM-100 Settlement as "merely confirm[ing] the Trenton Inventory and clarif[ying] staffing of the AFSM when there was a reduction in work." (Brief of Cross-Appellant/Appellee Trenton Metro in 08-4084 at 25.) Executing a bilateral clarification of an existing work assignment does not signal any intent to thereby resolve future tripartite disputes regarding changes to that work assignment. Nor is there any other evidence to provide a "'positive assurance' that the [AFSM-100 Settlement] aimed to address the present grievance." (App. at 13-14.)

> 3.  *If the AFSM-100 Settlement Were Meant to Apply to Jurisdictional Disputes, it Would be Void*

While the record indicates that the AFSM-100 Settlement was not intended to apply to jurisdictional disputes, if that had been the intent, the agreement would be void under RI-399. The terms of RI-399 provide that "[a]ny settlement" of a jurisdictional dispute "must be a tripartite settlement." (App. at 196.) The Q&A, signed by USPS, APWU, and NPMHU, clarified that any bilateral settlement agreement purporting to resolve a jurisdictional dispute "is not a proper settlement and is considered null and void." (Supp. App. at 55.) It does not matter that the AFSM-100

22

Settlement arose out of Article 15 of the CBA, rather than RI-399, because the Q&A explicitly says that the voiding rule applies even to settlements involving contracts other than RI-399, so long as they involve jurisdictional disputes. And it could not be otherwise without undermining the laudatory purpose of RI-399, which is to ensure that all concerned parties are involved in any resolution of a jurisdictional dispute. Thus, the RI-399 and the Q&A direct that any settlement agreement of any sort that purports to resolve a jurisdictional dispute must be tripartite and that any bipartite agreement is null and void. Consequently, even if the AFSM-100 Settlement were intended to apply to tripartite jurisdictional disputes, it would be void as merely a bipartite agreement.

### B. The District Court's Exercise of Jurisdiction

The parties have agreed that RI-399 provides the exclusive procedure for resolving jurisdictional disputes. Thus, our conclusion that this is a jurisdictional dispute mandates the further conclusion that it must be resolved pursuant to RI-399 according to binding tripartite arbitration procedures. Where a dispute is subject to a binding arbitration agreement, a "district court [is] … without jurisdiction to address the merits of the complaint." *Shaffer v. Mitchell Transport, Inc.*, 635 F.2d 261, 264 (3d Cir. 1980). Consequently, we must order the dismissal of Trenton Metro's complaint for lack of subject matter jurisdiction.[10]

---

[10] Our decision to vacate the judgment in favor of Trenton Metro and to require dismissal for lack of subject matter jurisdiction renders moot NPMHU's appeal of the denied Rule 60(b) motion and Trenton Metro's appeal of

23

## IV.    Conclusion

For the foregoing reasons, we will vacate the District Court's order granting summary judgment to Trenton Metro and will order the dismissal of Trenton Metro's complaint for lack of subject matter jurisdiction.

---

summary judgment in favor of USPS on damages.