**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 20-1634
_____

P&A CONSTRUCTION INC.; UTILITY SYSTEMS INC.,
Appellants

v.

INTERNATIONAL UNION OF OPERATING ENGINEERS
LOCAL 825;
UNITED STEEL PAPER AND FORESTRY RUBBER
MANUFACTURING
ENERGY ALLIED INDUSTRIAL AND SERVICE
WORKERS INTERNATIONAL
UNION LOCAL 15024 AFL-CIO
_____

On Appeal from the District Court for the
District of New Jersey
(D.C. No. 2:19-cv-18247)
District Judge: Susan D. Wigenton
_____

Argued April 22, 2021

Before: AMBRO, KRAUSE, and PHIPPS, *Circuit Judges*

(Filed: November 18, 2021)

Othiamba N. Lovelace          **[ARGUED]**
Ronald L. Tobia
Tobia & Lovelace
5 Sicomac Road
Suite 177
North Haledon, NJ 07508

     *Counsel for Appellant*

Gregory J. Hazley
Alexander Hemsley, III
Richard F.X. Regan          **[ARGUED]**
DeCotiis FitzPatrick Cole & Giblin
61 South Paramus Road
Suite 250
Paramus, NJ 07652

     *Counsel for Appellee Local 825*

Nathan L. Kilbert          **[ARGUED]**
United Steelworkers of America
Five Gateway Center
60 Boulevard of Allies
Room 807
Pittsburgh, PA 15222

David A. Tykulsker
David Tykulsker & Associates
161 Walnut Street
Montclair, NJ 07042

_____

OPINION OF THE COURT
_____

KRAUSE, *Circuit Judge.*

In a typical collective bargaining agreement ("CBA"), a single employer and a single union contract to arbitrate disputes over specified terms and conditions of employment, and their contract is enforceable in federal court under the Labor Management Relations Act ("LMRA"). *See* 29 U.S.C. § 185(a); *United Steelworkers of Am. v. Warrior & Gulf Nav. Co.*, 363 U.S. 574, 577–79 (1960). Today we address a much less typical situation and weigh in on an open question in our Circuit: Does the LMRA authorize a district court to compel joint arbitration between an employer and two separate labor unions, each of which has its own CBA with the common employer, when those unions claim the same work under their respective CBAs?[1] We conclude that joint arbitration is

_____

[1] The parties, like some courts, use the term "tripartite" arbitration, while others, perhaps more accurately, describe it as "joint" arbitration between more than two parties. *Compare*, *e.g.*, *Columbia Broad. Sys., Inc. v. Am. Recording & Broad. Ass'n*, 414 F.2d 1326, 1329 (2d Cir. 1969), *with Laborers' Union N. Am., Local No. 309 v. W.W. Bennett Const. Co., Inc.*, 686 F.2d 1267, 1273 (7th Cir. 1982). We have used both terms in the past. *See Trenton Metro. Area Local v. U.S. Postal Serv.*, 636 F.3d 45, 47 (3d Cir. 2011) (referring to "tripartite

3

available under the LMRA as a general matter, either before or after the bipartite arbitration award at issue has become final. As a result, we must also consider whether Appellants here, which are two at least nominally separate companies, can invoke that general rule. Because we conclude they cannot on this record, we will affirm the District Court's order denying joint arbitration.

## I.      Factual & Procedural Background

In 1972, P&A Construction, Inc., which builds roadway and utility projects, signed a CBA with United Steelworkers Local 15024. But in the early 1980s, according to P&A's Secretary-Treasurer Benedita Barrows, Local 825 Operating Engineers pressured P&A to employ them instead, so P&A created Utility Systems, Inc. ("Utility") to hire Local 825 workers. Utility signed a CBA with Local 825.

That resolved one problem, but it gave rise to another. From 2016 to 2018, Utility subcontracted a number of construction projects to P&A, which used its workers from

arbitration"); *Window Glass Cutters League of Am. v. Am. St. Gobain Corp.*, 428 F.2d 353, 355 (3d Cir. 1970) (referring both to "tripartite arbitration" and to "joint arbitration"). We adopt the latter convention here. While we retain "tripartite arbitration" where it appears in quotations, we note that "tripartite arbitration" in this context is not to be confused with its meaning in the context of choosing a three-arbitrator panel. *See* Note, *The Use of Tripartite Boards in Labor, Commercial, and International Arbitration*, 68 Harv. L. Rev. 293, 293–94 (1954).

Local 15024 on those jobs. But Utility's CBA with Local 825 required it to use only Local 825 workers, and Utility could only subcontract work if the subcontractor also agreed to abide by the terms of Utility's CBA with Local 825. Relying on those provisions, Local 825 brought multiple grievances against Utility, alleging that its subcontracting to P&A violated their CBA. In October 2018, Local 825's grievances proceeded to arbitration, where Local 825 sought only money damages.

At that point, Utility and P&A found themselves in a quandary. P&A feared that if Local 825's arbitrator ruled that Utility's subcontractors must use Local 825 workers, that might force P&A to violate its CBA with Local 15024, which requires P&A to use Local 15024 workers. P&A and Utility therefore tried to bring both unions to the same table by filing an LMRA suit in the District Court and requesting an order compelling joint arbitration with both employers and both unions.

There was just one problem: P&A is not a party to Utility's CBA with Local 825, and Utility is not a party to P&A's CBA with Local 15204. So P&A and Utility sought to persuade the District Court that it could and should compel joint arbitration in this circumstance, and that P&A and Utility qualified as a single or joint employer under the LMRA, by analogy with the single and joint employer doctrines under the National Labor Relations Act ("NLRA"). In the alternative, they requested arbitration under the so-called Harmony Agreement—a contract between Local 15024's parent union, the United Steelworkers International ("USW"), and Local 825's parent union, North America's Building Trades Union

5

("NABTU"), which allows for the arbitration of jurisdictional disputes between the USW and NABTU.

The District Court rejected each of those arguments. It accepted that it could enforce joint arbitration under the LMRA but determined that it would be inappropriate here because there was insufficient risk that P&A and Utility would face conflicting arbitration awards simultaneously granting the same jobs to both Local 825 and Local 15024. *P&A Const., Inc. v. Int'l Union of Operating Eng'rs Local 825*, No. 19-cv-18247, 2020 WL 773128, at *3 (D.N.J. Feb. 18, 2020). It also determined, after assessing the record of the employers' histories and relationship with each other, that P&A and Utility could not be deemed a single or joint employer. *Id.* Finally, it denied arbitration under the Harmony Agreement because "no party to this litigation is a party to the Harmony Agreement." *Id.* at *4 n.7. This appeal followed.

## II.     Jurisdiction & Standard of Review

The District Court had jurisdiction under 29 U.S.C. § 185(a) and 28 U.S.C. § 1331. We have jurisdiction under 28 U.S.C. § 1291, which gives us authority over "final decisions of the district courts." Here, although P&A and Utility initially sought additional forms of relief, they withdrew those requests with prejudice in a joint stipulation of dismissal in the District Court. Thus, as the parties confirmed at oral argument, there are no remaining claims before the District Court, and its February 18, 2020, order denying joint arbitration constitutes a final order. *See State Nat'l Ins. Co. v. County of Camden*, 824 F.3d 399, 408 (3d Cir. 2016); *DL Res., Inc. v. FirstEnergy Sols. Corp.*, 506 F.3d 209, 216 (3d Cir. 2007).

Assuming a district court has authority to compel joint arbitration, we review for abuse of discretion its decision whether to do so. *See Emery Air Freight, Corp. v. Int'l Bhd. of Teamsters, Local 295*, 185 F.3d 85, 91–92 (2d Cir. 1999).

## III.  Discussion

P&A and Utility seek to compel Local 825 and Local 15024 to participate in joint arbitration with them under the LMRA, either (A) viewing P&A and Utility as single or joint employers, or (B) under the auspices of the Harmony Agreement, treating the commitments of the parent unions as binding on Local 825 and Local 15024.  We address these issues in turn.

### A.  Joint Arbitration under the LMRA

To determine whether P&A and Utility are entitled to an order compelling joint arbitration under the LMRA, we must decide: (1) whether the LMRA generally authorizes federal courts to order joint arbitration; (2) when joint arbitration is available, *i.e.*, only before or also after the relevant bipartite arbitration award has become final; (3) how a district court should decide whether to compel joint arbitration in a particular case; and (4) who can seek to compel joint arbitration—specifically, under what circumstances two employers may be deemed a single or joint employer for purposes of compelling joint arbitration with two or more of their unions.

7

*1. Whether joint arbitration is available under the LMRA*

To determine whether joint arbitration is enforceable under the LMRA, the Supreme Court has instructed us to look to the text of the statute, the "policy of th[at] legislation," and the broader "policy of our national labor laws" to derive "the rule that will best effectuate the federal policy." *Textile Workers Union of Am. v. Lincoln Mills of Ala.*, 353 U.S. 448, 456–57 (1957). Using those guideposts, the six Courts of Appeals that have addressed the issue have concluded unanimously that joint arbitration is enforceable under the LMRA.[2] Previously, we too have observed, although in dictum, that "on a proper record a District Court clearly would have the authority to provide for joint arbitration of a labor dispute." *Window Glass Cutters of Am. v. Am. St. Gobain Corp.*, 428 F.2d 353, 355 (3d Cir. 1970) (citing *Columbia*

---

[2] *See Columbia Broad. Sys., Inc. v. Am. Recording & Broad. Ass'n* ("*CBS*"), 414 F.2d 1326, 1329 (2d Cir. 1969); *Local No. 850, Int'l Ass'n of Machinists v. T.I.M.E.-DC, Inc.*, 705 F.2d 1275, 1277–78 (10th Cir. 1983); *U.S. Postal Serv. v. Am. Postal Workers Union*, 893 F.2d 1117, 1120 (9th Cir. 1990); *Retail, Wholesale & Dept. Store Union, Local 390 v. Kroger Co.* ("*Wholesale*"), 927 F.2d 275, 281–82 (6th Cir. 1991); *U.S. Postal Serv. v. Nat'l Rural Letter Carriers' Ass'n*, 959 F.2d 283, 286 (D.C. Cir. 1992); *see also Laborers' Int'l Union N. Am., Local No. 309 v. W.W. Bennett Const. Co., Inc.*, 686 F.2d 1267, 1278 (7th Cir. 1982) (citing *CBS* with approval and observing that joint arbitration would have been available had the appellant "allege[d] facts sufficient to support [] an action" to "compel consolidation").

8

*Broad. Sys.*, 414 F.2d at 1328).  Today, we adopt that view precedentially. [3]

Three features of "the policy of our national labor laws," *Lincoln Mills*, 353 U.S. at 456, convince us to join the consensus.

First, joint arbitration advances the policy embodied in the text of the LMRA: "that federal courts should enforce [CBAs]."  *Id.* at 455.  The LMRA gives district courts jurisdiction over "[s]uits for violation of contracts between an employer and a labor organization," 29 U.S.C. § 185(a), and thus makes clear that an "agreement to arbitrate . . . contained in [a CBA] should be specifically enforced" by the federal courts, *Lincoln Mills*, 353 U.S. at 451.  A CBA, however, is "more than a contract"—it is a "generalized code" for a "particular plant" that must "govern a myriad of cases which the draftsmen cannot wholly anticipate." *Warrior & Gulf*, 363 U.S. at 578–79.  And, "to interpret such an agreement, it is [sometimes] necessary to consider the scope of other related collective bargaining agreements," especially when they are "resorted to for the purpose of settling a jurisdictional dispute

---

[3] Our concurring colleague urges that we hold joint arbitration unavailable under the LMRA because it is no longer necessary in this era of reduced labor strife.  As demonstrated by this very case, however, the demand for joint arbitration is hardly a thing of the past.  And even if it were, our construction of the statute may not shift with the prevailing winds of the labor market.  We are tasked with faithfully interpreting the LMRA consistent with Supreme Court precedent, and we fulfill that task today.

over work assignments." *Transp.-Commc'n Emps. Union v. Union Pac. R.R. Co.*, 385 U.S. 157, 161 (1966). Joint arbitration simply provides a forum in which to do so—conjoining bipartite arbitrations in which "both unions ha[ve] contracts with the same employer," claim the same jobs, and have arbitration provisions covering those jobs. *CBS*, 414 F.2d at 1328. By holding the parties to their respective arbitration agreements, but bringing them to the same table, the arbitrator can "consider the scope of [the] related [CBAs]," *id.*, and determine the parties' rights and obligations in an orderly and consistent way.[4]

---

[4] The principal concerns of our concurring colleague are therefore unfounded. Allowing district courts to enforce joint arbitration in appropriate circumstances does not compel parties to arbitrate without consent; it simply brings parties who have consented to arbitrate the same dispute with the same employer to a single venue. *CBS*, 414 F.2d at 1328. And the criteria that we (and the other Courts of Appeals) apply to determine when joint arbitration is appropriate include, among other things, the breadth of the arbitration provisions, the existence of conflicting arbitration awards, and the compatibility of the arbitration procedures in the two CBAs. *See* discussion *infra* Section III.A.3. As a result, the prospect for joint arbitration outside the scope to which the parties consented, imposition of incompatible arbitration procedures, or gamesmanship in the timing of arbitration or the selection of arbitrator is negligible. *See Emery*, 185 F.3d at 92 ("tactical" behavior by an employer seeking joint arbitration "militated in favor of denying" its request under this framework).

Second, joint arbitration serves the LMRA's policy goal of "promot[ing] industrial stabilization through the collective bargaining agreement." *Warrior & Gulf*, 363 U.S. at 578. Arbitration provisions in CBAs are a "major factor in achieving industrial peace," *id.*, but when two unions have "contracts with the same employer" and claim the same work under those CBAs, there is a risk of competing arbitration awards granting that work to different unions, which will only increase conflict, *CBS*, 414 F.2d at 1328. In such cases, the "national policy of furthering industrial peace by resort to agreed-upon arbitration procedures" requires a process that can bind all relevant parties and avoid conflicting awards. *Id.* Indeed, both employers and unions sometimes seek joint arbitration, *see, e.g.*, *Wholesale*, 927 F.2d at 277 (employer proposing that a matter be submitted to joint arbitration); *Air Line Pilots Ass'n, Int'l v. U.S. Airways Grp., Inc.*, 609 F.3d 338, 339–40 (4th Cir. 2010) (union seeking multi-party dispute

---

Nor is bargained-for consent to joint arbitration a panacea. *See* Concurrence at 9. While the inclusion of a joint arbitration clause is certainly to be encouraged where a union or employer can reasonably foresee conflicting obligations, and its absence is another criterion that a district court may consider, there are many circumstances where the parties may have no reason to anticipate the need for such a provision, but the district court nonetheless concludes that joint arbitration "best effectuate[s]" the LMRA and meets the criteria we set out below. *See Lincoln Mills*, 353 U.S. at 456–57; *see generally* Sherrard L. Hayes, Jr., Comment, *The Federal Circuits' Response to Conflicting Arbitration Awards in Labor Disputes*, 59 TENN. L. REV. 353, 364–65 (1992).

11

resolution under the Railway Labor Act), confirming that it does not favor either side but rather provides a forum where all parties can press their contractual claims without risk of inconsistent awards. Allowing district courts to consolidate bipartite arbitrations into a single joint proceeding thus furthers the LMRA's basic policy of settling disputes through arbitration. *CBS*, 414 F.2d at 1328.

Third, in the context of the Railway Labor Act ("RLA"), to which we look for guidance in fashioning a remedy under the LMRA, *see Emery*, 185 F.3d at 90, the Supreme Court has countenanced joint arbitration. In *Transportation-Communication Employees*, for example, the Court held that an employer and multiple labor unions can be compelled to participate in joint arbitration under the RLA to "settl[e] a jurisdictional dispute" between two unions that claim the same work. 385 U.S. at 160–61.[5] As the Second Circuit has

---

[5] The concurrence discounts the relevance of *Transportation-Communication Employees* on the grounds that, unlike the LMRA, the RLA mandates a dispute-resolution process and specifies that an Adjustment Board will serve as the exclusive adjudicator. 29 U.S.C. § 185(a). But the Court's holding that the Adjustment Board should have ordered joint arbitration was not predicated on the fact that a particular dispute-resolution process was statutorily prescribed by the RLA. Rather, the Court found that resolving two unions' claims to the same work separately "without [] determining which union ha[d] the right to perform the job" in a joint proceeding would encourage a "merry-go-round situation," which was antithetical to the RLA's purpose of promoting

reasoned, because LMRA disputes "parallel[] the type [of dispute] involved in *Transportation-Communication Employees*," *CBS*, 414 F.2d at 1329, the remedy of joint arbitration likewise should be afforded when appropriate in light of "the nature of the problem" presented, *Lincoln Mills*, 353 U.S. at 457.

### 2. *When joint arbitration is available*

In this case, because the arbitrator has already made an award in the arbitration proceeding between Utility and Local 825, *see Utility Sys., Inc. v. Int'l Union of Operating Eng'rs Local 825*, No. 20-cv-14369, 2021 WL 1138138 (D.N.J. Mar. 24, 2021), *appeal filed Apr. 28, 2021*, we must also decide when in the course of a labor dispute a party may seek joint arbitration.

---

"prompt and orderly settlement of all disputes." *Transportation-Communication Employees*, 385 U.S. at 162. That reasoning applies with full force in this case, as the LMRA serves an identical purpose. *See Warrior & Gulf*, 363 U.S. at 578. And the fact that an arbitrator, rather than a board, is given the exclusive authority to resolve arbitrable disputes in the LMRA context is immaterial: *Transportation-Communication Employees* held that—to avoid the risk of competing arbitration awards granting the same work to different unions—it is not only permissible but also appropriate for the designated authority to arbitrate the competing disputes of a single employer with two different unions within the same arbitration proceeding. *Transportation-Communication Employees*, 385 U.S. at 165.

Our sister circuits are divided on that question. On one side, the Ninth Circuit holds that the strong federal policy in favor of the finality of arbitration awards means that the benefits of joint arbitration should not "be achieved at the cost of overturning arbitrators' bipartite awards after they have been arrived at under [the parties'] collective bargaining agreements." *La.-Pac. Corp. v. Int'l Bhd. Elec. Workers, Local 2294*, 600 F.2d 219, 222, 226 (9th Cir. 1979). As a result, in that Circuit, "[p]arties must request court intervention *before* receiving conflicting awards." *Am. Postal Workers*, 893 F.2d at 1121. Put differently, both the parties and the district court must anticipate the possibility of competing awards, and they may only act preemptively.[6] In contrast, the Second, Sixth, and Tenth Circuits allow parties to seek joint arbitration even after bipartite awards have become final. *See Emery*, 185 F.3d at

---

[6] It is unclear how the Ninth Circuit's rule would treat the timing of the motion to compel here. *American Postal Workers* suggests that because P&A and Utility "request[ed] court intervention *before* receiving conflicting awards," 893 F.2d at 1121, they met the Ninth Circuit's requirement. But in *Louisiana-Pacific*, the Ninth Circuit was reviewing a case in which the arbitrators had rendered bipartite awards and the employers sued "to set aside th[o]se awards" and "obtain tripartite arbitration," 600 F.2d at 220, which is functionally similar to the timing here, where we are reviewing P&A's and Utility's request for joint arbitration after they have sued to set aside a bipartite award, *see Utility Sys.*, 2021 WL 1138138, at *1, even though that request to set aside the award is pending in a separate proceeding. We need not resolve that question, however, because we conclude that joint arbitration is available even after bipartite awards have become final.

14

92; *Wholesale*, 927 F.2d at 280; *T.I.M.E.-DC*, 705 F.2d at 1278. Those courts, in our view, have the better of the argument.

We align here with the majority because "[c]ircumstances could arise in which the later arbitration was not anticipated at the time the first arbitration was conducted, or in which it was unclear at the outset that the remedy or award in the arbitrations would impose conflicting obligations." *Emery*, 185 F.3d at 92. In addition, as the Sixth Circuit has emphasized, *see Wholesale*, 927 F.2d at 280, the Supreme Court has allowed joint arbitration under the RLA even after a bipartite award has become final because only joint arbitration can provide true finality and avoid the "merry-go-round" of each union pursuing conflicting bipartite awards, *Transp.-Commc'n Emp.*, 385 U.S. at 162.

In short, a party may seek joint arbitration either before or after bipartite arbitration awards have become final.[7] The upshot for this case is that the timing of the existing arbitration award in favor of Local 825 does not provide a ground to deny P&A's motion to compel.

---

[7] In some cases, though, the "firm federal policy [in favor of] the finality of a labor arbitrator's decision," *Louisiana-Pac. Corp.*, 600 F.2d at 223, may weigh against compelling joint arbitration. We discuss this issue further in Section III.A.3 below.

15

### *3. What criteria should a district court consider*

The next question is how a court, confronted with a motion to compel joint arbitration, should go about deciding whether it is "a suitable remedy" on the facts presented. *Am. Postal Workers*, 893 F.2d at 1120. What criteria can help guide its exercise of discretion?

While the ultimate question is whether joint arbitration will enforce the parties' CBAs and "further[] industrial peace," *CBS*, 414 F.2d at 1328, the Second Circuit in *Emery* compiled a non-exhaustive list of factors to consider:

> (i) the breadth of the relevant arbitration provisions; (ii) the existence (or likelihood) of conflicting arbitration awards; (iii) the compatibility of the arbitration procedures in the two collective bargaining agreements; (iv) the retrospective or prospective nature of the awards; and (v) whether the employer should have known of the potential conflict in its incipiency and should have acted to prevent it[, as well as] [o]ther factors [that the district court finds] relevant[.]

185 F.3d at 91 (citations omitted). The other Courts of Appeals apply these "*Emery* factors" in substance, if not in name, and we will adopt them as well, with two qualifications.

First, as a threshold matter, the party seeking joint arbitration must demonstrate a "contractual nexus . . . as to both (a) the parties and (b) the subject matter," *i.e.*, the jobs at issue. *Am. Postal Workers*, 893 F.2d at 1120. This prerequisite stems

16

from the general rule that "a party cannot be required to submit to arbitration any dispute which [it] has not agreed [] to submit," *Warrior & Gulf*, 363 U.S. at 582, so "[b]efore tripartite arbitration may be ordered," the district court must assure itself that "the parties involved . . . have a duty to engage in separate bipartite arbitration over the subject matter involved," *United Indus. Workers v. Kroger Co.*, 900 F.2d 944, 947 (6th Cir. 1990).

Second, "the existence (or likelihood) of conflicting arbitration awards," *Emery*, 185 F.3d at 91, carries particular weight in the equitable analysis, and in many cases it will be dispositive. That is because the "national policy" embodied in the LMRA is the goal of "furthering industrial peace by resort to agreed-upon arbitration procedures," *CBS*, 414 F.2d at 1328, and as we have explained, inconsistent arbitration awards are only likely to increase conflict, not "to promote industrial stabilization," *Warrior & Gulf*, 363 U.S. at 578. Joint arbitration therefore becomes increasingly appropriate as the likelihood grows that there will be competing arbitration awards granting the same work to different unions "to the exclusion of [each] other." *Wholesale*, 927 F.2d at 281.[8]

---

[8] The likelihood of conflicting awards may also be influenced by the prospective or retrospective nature of the relief that is sought in arbitration. An employer can simultaneously comply with two inconsistent but retrospective awards, even if it would prefer not to pay two sets of workers for just one job. But requests for prospective relief can "place[ the employer] in the impossible position of having to comply with both awards coextensively." *T.I.M.E.-DC*, 705

Having clarified the factors relevant to the court's decision on whether to compel joint arbitration, *Emery*, 185 F.3d at 91, we next consider who may move to compel and whether the District Court here erred in denying that relief.

### 4. *Who may seek to compel joint arbitration*

While joint arbitration is generally available under the LMRA and the existence of a bipartite award here does not justify denying P&A and Utility's motion, this is not a typical joint arbitration case in which "the two competing unions each had broad arbitration agreements with the same employer." *Bennett Const.*, 686 F.2d at 1274. Rather, P&A and Utility are, at least nominally, separate companies. We must therefore consider (a) whether they can still establish the "contractual nexus" required for joint arbitration, *Am. Postal Workers*, 893 F.2d at 1120, and, if so, (b) whether the overall equities favor it.

### a. The contractual nexus requirement

At the threshold, P&A and Utility have failed to establish the necessary "contractual nexus" connecting "the parties" and "the subject matter." *Id.* As for the parties, "in every case [where courts have allowed joint arbitration,] the two competing unions each had broad arbitration agreements with the same employer," *Bennett Const.*, 686 F.2d at 1274, but

---

F.2d at 1276 (quoting the district court's factual findings). For that very reason, the Sixth Circuit permits joint arbitration even after a bipartite award has become final. *See Wholesale*, 927 F.2d at 281.

18

here, Local 825 only had a CBA with Utility, and Local 15024 only had a CBA with P&A.  Local 825, in other words, did not agree to arbitrate with P&A, nor did Local 15024 with Utility. *See Warrior & Gulf*, 363 U.S. at 582.  As for "the subject matter," *Am. Postal Workers*, 893 F.2d at 1120, Local 825 only claimed jobs from Utility, while Local 15024 only claimed jobs from P&A, so there was not a true "jurisdictional dispute" between two unions claiming the same work, *see CBS*, 414 F.2d at 1328–29.

As a result, P&A and Utility can only seek joint arbitration if they are considered a single or joint employer for purposes of the LMRA.  They fit that description, they contend, if we apply the definitions of "single employer" and "joint employer" that the courts and the National Labor Relations Board have developed under the NLRA.  *See N.L.R.B. v. Browning-Ferris Indus. Pa., Inc.*, 691 F.2d 1117, 1121 (3d Cir. 1982).  In that context, "two nominally separate entities" constitute a "single employer" where there is "(1) functional integration of operations; (2) centralized control of labor relations; (3) common management; and (4) common ownership." *Id.* at 1122.  And two companies will be found to be "joint employers" where "one employer[,] while contracting in good faith with an otherwise independent company, has retained for itself sufficient control of the terms and conditions of employment of the employees who are employed by the other employer." *Id.* at 1123.

Some Courts of Appeals have imported a "single employer" theory from the NLRA context to resolve issues in

19

LMRA cases.[9]  But we do not need to decide the relevance of the NLRA for joint arbitration under the LMRA today because,

_____

[9] Specifically, some courts have borrowed the "single employer" and the "alter ego" theories from the NLRA context to hold non-signatories to the terms of a CBA in LMRA cases. *See, e.g.*, *Sheet Metal Workers v. Arizona Mech. & Stainless, Inc.*, 863 F.2d 647, 651 (9th Cir. 1988); *Carpenters Local Union No. 1846 v. Pratt-Farnsworth, Inc.*, 690 F.2d 489, 511, 522 (5th Cir. 1982).  Others use only the "alter ego" theory to bind a non-signatory to the terms of a CBA under the LMRA. *See, e.g.*, *Penntech Papers, Inc. v. N.L.R.B.*, 706 F.2d 18, 24 (1st Cir. 1983); *Local Union No. 59 v. Namco Elec., Inc.*, 653 F.2d 143, 147 (5th Cir. 1981).  In *Laborers' Int'l Union of North Am. v. Foster Wheeler Corp.*, 868 F.2d 573 (3d Cir. 1989) (per curiam), we held that an "alter ego" theory could allow a union to compel arbitration with both its employer and its employer's parent corporation under the LMRA, so we remanded for factual findings regarding alter ego status, *see id.* at 574, 576–77, and in *American Bell, Inc. v. Federation of Telephone Workers*, we analyzed whether a non-signatory to a CBA in an LMRA case was the alter ego of or a single employer with the signatory company but found both theories inapplicable on the facts presented.  736 F.2d 879, 886–89 (3d Cir. 1984).  As we noted in that case, there are many "approach[es] to corporate veil piercing," including, where relevant, "a less precise notion that the corporations simply acted interchangeably and in disregard of their corporate separateness."  *Am. Bell*, 736 F.2d at 886–87 (quoting *Publicker Indus., Inc. v. Roman Ceramics Corp.*, 603 F.2d 1065, 1070 (3d Cir. 1979)).  The First Circuit has likewise

even under the NLRA standard, P&A and Utility failed to provide sufficient evidence that they are a single employer or joint employers.

True, Barrows did state in her certification that she was the Secretary-Treasurer of both P&A and Utility; that P&A created Utility to hire Local 825; and that P&A had an informal, unwritten "work-sharing agreement" in which Utility employed Local 825 and P&A employed Local 15024 on construction projects they performed together, App. 48–49. P&A also said in a letter demanding arbitration with Local 15024 that Utility is "owned by the Principals of P&A," App. 120, and Local 825's Benefit Fund stated, while it was auditing Utility, that P&A is a "related company" to Utility, App. 77. But that record is insufficient to make a single or joint employer finding.

As to single employer status, there was no evidence, only allegations, regarding the "functional integration of operations" and "centralized control of labor relations" at Utility and P&A. *Browning-Ferris*, 691 F.2d at 1122. There

---

recognized, that an alter ego theory would use a uniquely federal version of the veil-piercing test to suit "the purpose of the federal statute," which may mean that it "gives less respect to the corporate form than does the strict common law alter ego doctrine" in order to enforce the policy of our national labor laws. *Bhd. of Locomotive Eng'rs v. Springfield Terminal R.R. Co.*, 210 F.3d 18, 26–27 (1st Cir. 2000) (quoting *Town of Brookline v. Gorsuch*, 667 F.2d 215, 221 (1st Cir. 1981)). While we acknowledge this ongoing discussion among the Circuits, we do not have occasion to delve into it today.

21

was also no evidence of "common ownership," *id.*, aside from a vague assertion in a letter to Local 15024 that Utility is "owned by the Principals of P&A," App. 120. And although Barrows may be the Secretary-Treasurer of both P&A and Utility, that is not enough to show "common management," *Browning-Ferris*, 692 F.2d at 1122, because she is only one officer.

As to joint employer status, for the same reasons, there was no evidence that either P&A or Utility "retained for itself sufficient control of the terms and conditions of employment" of the other company's employees or "co-determine[d] those matters governing the essential terms and conditions of employment" for both of their respective labor unions. *Id.* at 1123. Thus, even if the single or joint employer theory from the NLRA context is cognizable as a basis for compelling joint arbitration under the LMRA, P&A and Utility still have failed to establish the requisite "contractual nexus" here. *Am. Postal Workers*, 893 F.2d at 1120. As a result, Local 825 was under no obligation to arbitrate with P&A, and Local 15024 was under no obligation to arbitrate with Utility.

Put another way, instead of a triangular relationship between one employer and two unions, which could support joint arbitration, this case involves two parallel lines, each of which connects a different union with a different employer, and those two lines never intersect. So the unions did not have "a duty to engage in separate bipartite arbitration [with both P&A and Utility] over the subject matter involved," *United Indus. Workers*, 900 F.2d at 947, which means that joint arbitration was necessarily impermissible here.

22

b. <u>The remaining equitable considerations</u>

If there were any doubt, the other equitable considerations also weigh against compelling joint arbitration here. We cannot evaluate "the breadth of the relevant arbitration provisions" or determine whether "the arbitration procedures in the two collective bargaining agreements" are "compatib[le]," *Emery*, 185 F.3d at 91, because the record does not even contain a copy of P&A's CBA with Local 15024. There is also no realistic prospect for "conflicting arbitration awards" because Local 825 only sought "retrospective" relief in its arbitration with Utility. *Id.* And because Utility knew of its contractual obligations to Local 825 when it subcontracted to P&A, there is a strong argument that it "should have known of the potential conflict in its incipiency and should have acted to prevent it." *Id.* Joint arbitration is thus not "a suitable remedy," *Am. Postal Workers*, 893 F.2d at 1120, in light of the record and given "the nature of the problem" presented here, *Lincoln Mills*, 353 U.S. at 457.[10]

---

[10] P&A and Utility have asked that if we adopt the *Emery* factors, we remand to the District Court so that they can brief those factors. But P&A and Utility already had their bite at that apple, as their briefing before the District Court cited *Emery*, many of the cases on which *Emery* relied, and other circuit cases on the appropriateness of arbitration. *See* DCD 6–1, at 6–7; *Emery*, 185 F.3d at 91. The equitable analysis employed by the District Court was thus hardly a surprise. And because P&A and Utility cannot establish the contractual nexus requirement in any event, remand would be futile.

23

In short, in the absence of the requisite contractual nexus, and with the *Emery* factors pointing in the unions' favor, the District Court did not abuse its discretion by denying P&A and Utility's motion to compel joint arbitration under the LMRA.

**B. Harmony Agreement Arbitration**

In the alternative, P&A and Utility seek to compel joint arbitration under the Harmony Agreement. But they face two obstacles, which are ultimately insurmountable.

First, Local 825's and Local 15024's parent unions are parties to the Harmony Agreement. But Local 825 and Local 15024 are not. As a result, neither Local 825 nor Local 15024 can be forced to arbitrate under that agreement. *See Warrior & Gulf*, 363 U.S. at 582 ("[A] party cannot be required to submit to arbitration any dispute which [it] has not agreed so to submit."); *In re Gen. Teamsters, Warehousemen & Helpers Union*, 265 F.3d 869, 874–75 (9th Cir. 2001) ("[F]ederal labor law has steadfastly recognized the separation of the International from its local affiliate.").

Second, P&A and Utility, as non-signatories, have no power to enforce the Harmony Agreement unless they can establish that they are third-party beneficiaries. *See* Restatement (Second) of Contracts § 304 (1981). But they cannot make that showing because the record here is devoid of any evidence that the parties to the Harmony Agreement

24

"intend[ed] to give [P&A and Utility] the benefit of the promised performance." *Id.* § 302.

The District Court therefore properly rejected the Harmony Agreement as an alternative basis to compel arbitration.

**IV.    Conclusion**

For the foregoing reasons, we will affirm the order of the District Court.

*P&A Construction Inc. v. International Union of Operating Engineers Local 825*, No. 20-1634

PHIPPS, *Circuit Judge*, concurring in the judgment.

As commonly used by courts, the term, 'tripartite arbitration,' is a euphemism for a court order compelling a third party to participate in binding arbitration with the parties to a collective bargaining agreement. Typically, as here, such court-ordered arbitration presents itself as a solution to jurisdictional disputes – disagreements between two rival unions over a set of jobs with the same employer.[1] The rationale for resorting to this practice is not complicated: if all three parties affected by the jurisdictional dispute – the employer and the two feuding unions – are forced to the same arbitration, that should increase the likelihood of a holistic resolution that would award the disputed jobs to one union or

---

[1] *See Transportation-Communications Emps. Union (TCEU) v. Union Pac. R.R. Co.*, 385 U.S. 157, 161 (1966) ("The ordinary jurisdictional dispute arises when two or more unions claim the right to perform a job which existed at the time their collective bargaining contracts with the employer were made."); *Carey v. Westinghouse Elec. Corp.*, 375 U.S. 261, 263 (1964) (describing one species of jurisdictional disputes as "a controversy as to whether certain work should be performed by workers in one bargaining unit or those in another"); *Trenton Metro. Area Local of the Am. Postal Workers Union, AFL–CIO v. U.S. Postal Serv.*, 636 F.3d 45, 54 (3d Cir. 2011) (describing a "jurisdictional dispute" as "any dispute over which union's workers are properly staffed on a particular job").

1

the other, but not both.[2]  By reducing the employer's exposure to double liability, tripartite arbitration tends to favor the employer, especially if the jurisdictional dispute involves a large number of jobs.  But an employer that fears being caught between dueling unions can achieve that same advantage more predictably and without court intervention by including consensual tripartite arbitration clauses in its collective bargaining agreements with each union.[3]  Rather than leaving it to employers and unions to account for those concerns through the bargaining process – as this Circuit has done until today[4] – the Majority Opinion makes new law for this Circuit.  Under the common-law rule announced today, upon satisfaction of a threshold nexus requirement and favorable

---

[2] *See TCEU*, 385 U.S. at 161 (explaining that in resolving a jurisdictional dispute, "it would be highly unlikely that each [collective bargaining agreement] could be construed as giving each union the right to be paid for the single job").

[3] *See* Sherrard L. Hayes, Jr., Comment, *The Federal Circuits' Response to Conflicting Arbitration Awards in Labor Disputes: Split or Harmony Between the Sixth and Ninth Circuits?*, 59 Tenn. L. Rev. 353, 364 (1992) ("If an employer negotiates for the inclusion of a tripartite arbitration clause in each collective bargaining agreement, the problem may be avoided altogether."); Douglas Leslie, *The Role of the NLRB and the Courts in Resolving Union Jurisdictional Disputes*, 75 Colum. L. Rev. 1470, 1498 (1975) ("The employer's solution – particularly where there are two unions having one or more units in the same plant – lies in negotiating consensual tripartite arbitration agreements.").

[4] *See Trenton Metro. Area Local*, 636 F.3d at 56 (giving effect to consensual tripartite arbitration clauses).

2

consideration of multiple factors, a federal court may now compel a third party to participate in arbitration under the terms of a collective bargaining agreement that it did not join.

Despite the great care of the Majority Opinion, the test that it sets forth is not particularly workable. The threshold nexus determination is not made initially by an arbitrator, but rather by a federal judge. By necessarily involving federal courts, the nexus requirement undermines federal labor policy, the guidepost for labor common law, which seeks to encourage industrial self-governance without resort to courts.[5] The remainder of the Majority Opinion's test – consideration of a non-exhaustive list of factors, mostly of indeterminate weights – makes it difficult to predict whether a federal court will, in its discretion, order tripartite arbitration. It is also telling that the new test does not permit tripartite arbitration here, in the seminal case on this subject in this Circuit.

But even a rule that sparingly permits compelled tripartite arbitration is a mistake. Compelled tripartite arbitration is antithetical to the fundamental principle of labor arbitration that an arbitrator's authority derives from *consent* to the grievance procedures in a collective bargaining agreement. That principle emanates from statutory text, which authorizes

---

[5] *See United Steelworkers of Am. v. Warrior & Gulf Navigation Co.*, 363 U.S. 574, 581 (1960) ("[T]he grievance machinery under a collective bargaining agreement is at the very heart of the system of industrial self-government.").

suits for violations of labor contracts,[6] which are predicated on the consent of the parties.[7] It is also imprudent for this Court to authorize compelled tripartite arbitration because the benefits from that process may be achieved by other more efficient, predictable, and just means – bargained-for consent to tripartite arbitration. Nor is now the time to make new common law: this Circuit has endured long periods of far greater labor strife without resort to compelled tripartite arbitration. For these reasons, elaborated below, I respectfully disagree with the Majority Opinion, and I concur only in the judgment.

    1.   Compelled Tripartite Arbitration Is Inimical to the Essential Role of Consent in Labor Arbitration.

The legal foundation for labor arbitration rests on the consent of parties to a collective bargaining agreement to be

---

[6] *See* 29 U.S.C. § 185(a) (authorizing "[s]uits for violation of *contracts* between an employer and a labor organization" (emphasis added)).

[7] *Gateway Coal Co. v. United Mine Workers of Am.*, 414 U.S. 368, 374 (1974) ("No obligation to arbitrate a labor dispute arises solely by operation of law. The law compels a party to submit his grievance to arbitration only if he has contracted to do so."); *Warrior & Gulf*, 363 U.S. at 582 ("The Congress . . . has by [§] 301 of the Labor Management Relations Act, assigned the courts the duty of determining whether the reluctant party has breached his promise to arbitrate. For arbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit.").

bound by an arbitrator's ruling. In an expression that it later characterized as "[t]he first principle" of its labor arbitration jurisprudence,[8] the Supreme Court explained that "arbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit."[9] The Supreme Court has reaffirmed that principle repeatedly. It later declared that "[t]he law compels a party to submit his grievance to arbitration only if he has contracted to do so."[10] And again it tethered the labor arbitrator's authority to the consent of the parties: "arbitrators derive their authority to resolve disputes only because the parties have agreed in advance to submit such grievances to arbitration."[11]

That core principle of consent to arbitration by itself precludes compelled tripartite arbitration. Without giving its consent, a third party should not be forced to arbitrate under a collective bargaining agreement that it did not join. By disregarding consent, compelled tripartite arbitration eviscerates "not only [arbitration's] legal root but also its greatest source of strength, promoting as it does the acceptability of awards by the parties."[12]

---

[8] *AT&T Techs., Inc. v. Commc'ns Workers of Am.*, 475 U.S. 643, 648 (1986).

[9] *Warrior & Gulf*, 363 U.S. at 582.

[10] *Gateway Coal Co.*, 414 U.S. at 374.

[11] *See AT&T Techs., Inc.*, 475 U.S. at 648–49 (citing *Gateway Coal Co.*, 414 U.S. at 374).

[12] Merton Bernstein, Comment, *Nudging and Shoving All Parties to a Jurisdictional Dispute into Arbitration: The*

5

Nor does an arbitrator have any authority over a nonconsenting third party. One of the most important aspects of an arbitration agreement is its method for selecting an arbitrator.[13] Resolution of a dispute may hinge on the identity of the arbitrator.[14] But in compelled tripartite arbitration, only the two parties to the collective bargaining agreement have specified the method for selecting the arbitrator. By forcing a third party to arbitrate against its will in front of an arbitrator that it had no role in selecting, compelled tripartite arbitration adds another dimension to its offense against the consensual nature of arbitration.

---

*Dubious Procedure of* National Steel, 78 Harv. L. Rev. 784, 786 (1965).

[13] *See Lefkovitz v. Wagner*, 395 F.3d 773, 780 (7th Cir. 2005) (Posner, J.) ("Selection of the decision maker by or with the consent of the parties is the cornerstone of the arbitral process.").

[14] *See United Steelworkers of Am. v. Enter. Wheel & Car Corp.*, 363 U.S. 593, 599 (1960) (explaining that the lenient standard of judicial review for a labor arbitrator's decision is based on the fundamental principle that "[i]t is the arbitrator's construction which was bargained for"); Clyde W. Summers, *Labor Arbitration: A Private Process with a Public Function*, 34 Rev. Jur. U.P.R. 477, 490 (1965) ("Because the parties view the identity of the arbitrator as an important part of the process and the choice of the two unions might be quite different, this cannot be dismissed as a minor encroachment on their freedom of contract. It is this which strips court ordered tri-partite arbitration of its appeal.").

The Majority Opinion neglects these deep problems and instead references the lone instance in which the Supreme Court has permitted an adjudicator to bind a third party in the resolution of a jurisdictional dispute. But that case, *Transportation-Communications Employees Union (TCEU) v. Union Pacific Railroad Co.*, 385 U.S. 157 (1966), is not really an arbitration case at all. It involved a statutorily mandated approach to resolving jurisdictional disputes in the context of railroads and their employee unions. It did not involve the Labor Management Relations Act but rather a separate statute, the Railway Labor Act. Unlike the LMRA, the Railway Labor Act specifies the process for resolving disputes "concerning rates of pay, rules, or working conditions" between railroad employers and labor unions.[15] Under that process, either the carrier or the union may petition to the appropriate division of the National Railroad Adjustment Board to adjudicate the dispute.[16] The Adjustment Board consists of thirty-four members, half selected by railroad carriers, the other half by labor organizations.[17] That is quite different from the LMRA, which does not mandate any dispute-resolution process, does not specify the adjudicator, and does not establish a process for appointing adjudicators.[18] In the absence of those conditions – which are not present here – the Supreme Court has never compelled a third party to participate in the resolution of a jurisdictional dispute.

---

[15] 45 U.S.C. § 153(i).

[16] *See id.*

[17] *See id.* § 153(a).

[18] *See* 29 U.S.C. § 185(a).

7

Instead of looking to caselaw under the Railway Labor Act for guidance on arbitration under the LMRA, the Federal Arbitration Act provides a far superior source of jurisprudence. The Supreme Court has endorsed this approach by recognizing that "federal courts have often looked to the [Federal Arbitration Act] for guidance in labor arbitration cases."[19] And, as in labor arbitration, a central principle of the Federal Arbitration Act is that "[a]rbitration is strictly a matter of consent."[20] Yet, as explained above, compelled tripartite arbitration cannot be reconciled with the core principle of consent. At most, unions with arbitration clauses in their collective bargaining agreements consented to arbitrate with the employer – not with each other.[21] The lack of such consent should foreclose compelled tripartite arbitration as a means of resolving jurisdictional disputes under the LMRA.[22]

---

[19] *United Paperworkers Int'l Union, AFL-CIO v. Misco, Inc.*, 484 U.S. 29, 40 n.9 (1987).

[20] *Lamps Plus, Inc. v. Varela*, 139 S. Ct. 1407, 1415 (2019) (quoting *Granite Rock Co. v. Teamsters*, 561 U.S. 287, 299 (2010)); *see also Stolt-Nielsen S.A. v. AnimalFeeds Int'l Corp.*, 559 U.S. 662, 681 (2010) ("[The Federal Arbitration Act] imposes certain rules of fundamental importance, including the basic precept that arbitration 'is a matter of consent, not coercion.'" (quoting *Volt Info. Scis., Inc. v. Bd. of Trs. of Leland Stanford Junior Univ.*, 489 U.S. 468, 479 (1989))).

[21] *See* Summers, 34 Rev. Jur. U.P.R. at 489 ("The lack of consent lies in the fact that each union agreed to arbitrate with the employer but not with each other, and the employer agreed to arbitrate with each union but not with both together.").

[22] *See generally* Bernstein, 78 Harv. L. Rev. at 785 (questioning whether the efficacy and efficiency interests

8

2. Compelled Tripartite Arbitration Is Unnecessary, and It Has Adverse Side Effects.

There is also no practical need for court-ordered tripartite arbitration. This Circuit recognizes that consensual tripartite arbitration clauses are enforceable,[23] and that rule gives employers and unions the freedom to negotiate for tripartite arbitration on terms of their own choosing.

Consistent with that flexibility, an employer may choose whether to seek tripartite arbitration clauses in each of its collective bargaining agreements. Such a clause may reduce the employer's exposure in potential jurisdictional disputes. But to induce unions to agree to such a term, the employer will likely have to use some of its bargaining leverage, with the unions possibly obtaining more favorable terms in other respects. Alternatively, an employer may determine that the risk or the size of a jurisdictional dispute is minimal. In that situation, the employer may not wish to expend its negotiation capital to obtain the unions' consent to tripartite arbitration. Regardless of the employer's choice, this Circuit's prior precedent respects that decision and has enforced consensual tripartite arbitration clauses but has never mandated tripartite arbitration in the absence of such terms.[24]

---

motivating compelled tripartite arbitration provide "a good reason for cutting arbitration loose from its conventional basis – agreement of the parties to resolve the dispute in a forum of their own choice").

[23] *See Trenton Metro. Area Local*, 636 F.3d at 56.

[24] *See id.*

The common-law rule that the Majority Opinion promulgates today upsets that dynamic in a way that harms both unions and employers. A union that is forced into tripartite arbitration loses its ability to obtain concessions that the employer likely would make to secure its consent to tripartite arbitration. That reality exacerbates the injustice of tripartite arbitration: not only must a third-party union arbitrate against its will before an arbitrator whom it did not choose, but it also loses the opportunity to obtain favorable terms in exchange for participating in tripartite arbitration. Making matters worse, the potential for compelled tripartite arbitration discourages employers from negotiating for consensual tripartite arbitration clauses. Instead of bargaining for tripartite arbitration, employers may seek to obtain it for free from courts under the test formulated by the Majority Opinion.

For similar reasons, a common-law rule allowing compelled tripartite arbitration is unfair to certain employers. If an employer negotiated consensual tripartite arbitration clauses, it likely spent negotiation capital to obtain those clauses. Yet by today's rule, other employers that did not expend bargaining capital on consensual tripartite arbitration clauses may still be able to compel tripartite arbitration. Thus, today's rule bestows a potential competitive advantage upon employers that have not negotiated for tripartite arbitration clauses.

Also, instead of fostering amicable labor relations, court-ordered tripartite arbitration promotes gamesmanship. Suppose an employer with two collective bargaining agreements negotiated a very favorable arbitrator-selection clause with one union but not the other. If a jurisdictional dispute arises, that employer has a strong incentive to race to

10

federal court to compel tripartite arbitration under the terms of the collective bargaining agreement with the favorable arbitrator-selection clause. A similar situation may arise if one union in a jurisdictional dispute negotiated a favorable arbitrator-selection clause in its collective bargaining agreement. That union may also hasten to court to compel tripartite arbitration on the terms of its collective bargaining agreement to obtain an advantage over its rival union, which had no say in the selection of that arbitrator. As these examples demonstrate, by permitting compelled tripartite arbitration, this Circuit adds an element of gamesmanship to jurisdictional disputes.

In sum, the side effects of court-ordered tripartite arbitration undermine several important aspects of federal labor policy. By contrast, bargained-for tripartite arbitration clauses provide a predictable and efficient means of resolving jurisdictional disputes – without the necessity of federal-court involvement.

3. Current Labor Conditions Do Not Justify a New Common-Law Rule Permitting Compelled Tripartite Arbitration.

Finally, as to timing, there is absolutely no urgency to green-light compelled tripartite arbitration in this Circuit. Labor conditions are very different today than they were in 1947, when Congress enacted the LMRA,[25] or in 1969, when the Second Circuit first permitted compelled tripartite

---

[25] Labor Management Relations (Taft-Hartley) Act, Pub. L. No. 117-45, 61 Stat. 156 (1947).

arbitration.[26]  At the peak of labor unrest after the passage of the LMRA, in 1952, there were 470 work stoppages of a thousand or more workers, which combined had 2.7 million workers on strike.[27]  Similarly, in 1970, the year after the Second Circuit's decision, there were 381 work stoppages involving a thousand or more workers for a total of 2.4 million workers on strike.[28]  Yet, last year, there were only eight work stoppages involving over a thousand workers, for a total of 27,000 workers on strike.[29]  Nor was last year an aberration from the recent trend – no more than twenty-five work stoppages involving over a thousand employees have occurred in any one year since 2001.[30]  The number of workers on strike last year is 99% less than in 1952, at the peak of labor unrest after the LMRA was passed (27,000 compared to 2.7 million), and over 98% less than in 1970, the year after court-ordered tripartite arbitration was first approved (27,000 compared to 2.4 million).  This significant decrease in labor unrest demonstrates that compelled tripartite arbitration is not presently needed to alleviate labor tensions.

---

[26] *See CBS v. Am. Recording & Broad. Ass'n*, 414 F.2d 1326 (2d Cir. 1969).

[27] *See Work Stoppages: Annual Work Stoppages Involving 1,000 or More Workers, 1947–Present*, U.S. Bureau of Labor Statistics (Mar. 1, 2021) https://www.bls.gov/web/wkstp/annual-listing.htm#annual-listing.xlsx.f.4.

[28] *See id.*

[29] *See id.*

[30] *See id.*

The remaining policy justifications for compelled tripartite arbitration have even less force under today's market conditions. The potential efficiencies generated by compelled tripartite arbitration – which may be illusory given the enhanced opportunities for gamesmanship – are not market-altering and do not justify violating the fundamental principle that parties must consent to arbitration.[31] Nor are those potential efficiencies unique to *compelled* tripartite arbitration; *consensual* tripartite arbitration clauses can achieve the same results more efficiently, fairly, and reliably.

A sense of perspective is important too. This Circuit has endured far more volatile periods of labor strife without authorizing compelled tripartite arbitration. If for no other reason, a common-law rule permitting compelled tripartite arbitration should be rejected out of respect for this Court's prior forbearance in those far more trying times of labor unrest.

\* \* \*

Compelled tripartite arbitration is problematic in principle and pernicious in practice. Nothing about the text of the LMRA supports allowing courts to order tripartite arbitration upon satisfaction of a threshold nexus requirement and a favorable balancing of a multifactor test. Although this new rule will permit compelled tripartite arbitration only in rare circumstances not present here, for the reasons above, I would categorically reject the doctrine, and therefore I concur only in the judgment.

---

[31] *See* Bernstein, 78 Harv. L. Rev. at 786 ("The root of consent should be preserved in the face of all but the gravest threats of national emergency.").